SCHARBAUER et al. v. LAMPASAS COUNTY et al. (No. 5941.)*

(Court of Civil Appeals of Texas. June 20, 1919.)

1. PARTNERSHIP ⬤⟳41—FRAUDULENT ORGANIZATION OF CORPORATION—LIABILITY OF OFFICERS.

Where charter was obtained from territory of Arizona for bonding and insurance company, which was never organized in Arizona in compliance with its laws, but was attempted to be organized in Texas, where most of its stockholders and directors resided, and virtually all of its business was subsequently done, the pretended corporation was a fraud on the states of Arizona and Texas, and the company's pretended directors were liable as individuals or partners to a county of Texas on a bridge contractor's bond; Rev. St. 1911, art. 1138, preventing collateral attack on validity of an ostensible corporation, having no application.

2. COUNTIES ⬤⟳123—CONTRACTOR'S BONDS—PARTIES NOT PROTECTED.

Sureties on the bond of a bridge contractor with a county, though liable to the county, were not liable to parties not mentioned in the bond, and not protected by it in any way, who furnished material, etc., for the construction of the bridges.

3. COUNTIES ⬤⟳123—BOND OF CONTRACTOR—PROTECTION OF LABORERS AND MATERIALMEN.

In order to constitute a sufficient statutory obligation, the bond of a contractor with a county must comply substantially with the terms and requirements of the statute, and, when it appears from the bond that no effort was made to condition it for the payment of laborers and materialmen, Rev. St. 1911, art. 5623, so requiring, will not be read into the instrument to create a liability not disclosed by the language used.

4. COUNTIES ⬤⟳123—INSUFFICIENT STATUTORY BOND — ENFORCEMENT UNDER COMMON LAW.

As to county contractor's bond, the rule that instruments insufficient as statutory bonds may be enforced as common-law obligations has no application unless it appears on the face of the instrument that it was executed for the benefit of the person seeking to enforce it.

5. ESTOPPEL ⬤⟳90(1)—ESTOPPEL IN PAIS—EQUITABLE LIEN.

County held not entitled to an equitable lien, based on the doctrine of estoppel, as against the seller of materials to its bridge contractor, though after the property was delivered to the contractor the county paid it 60 per cent. of the contract price of the work, and after its delivery and the making of the payment the seller caused the property to be seized.

6. LIENS ⬤⟳16 — RIGHT TO EQUITABLE LIENS—WAIVER.

A county which contracted with a construction company for completed bridges, and accepted a bond as surety for the contractor's faithful performance, thereby waived its right, if it had any, to invoke the doctrine of equitable liens on property sold the contractor by third parties.

Appeal from District Court, Lampasas County; F. M. Spann, Judge.

Consolidated actions by Lampasas County against the Hess & Skinner Engineering Company and others, wherein certain parties intervened, and John Scharbauer and others were made parties defendant. From judgment for plaintiff against John Scharbauer and certain other defendants, etc., such defendants appeal. Affirmed in part, reversed and rendered in part.

Ocie Speer and Marvin H. Brown, both of Ft. Worth, for appellants.

J. Tom Higgins, County Judge, and Matthews & Browning, all of Lampasas, for appellee Lampasas County.

Reid Williams, of Dallas, and W. D. Cardwell, of Wichita Falls, for appellee Missouri Valley Bridge & Iron Co.

J. C. Abney, of Lampasas, for appellee W. F. & J. F. Barnes Lumber Co.

KEY, C. J. We copy from appellants' brief the following concededly correct statement:

"This is a consolidated action from the district court of Lampasas county, as follows:

"Cause No. 3218 was originally instituted by Lampasas county against Hess & Skinner Engineering Company and Commonwealth Bonding & Casualty Insurance Company to recover as against the one as principal and the other as surety upon a certain bridge building contract and bond. Cause No. 3220 was instituted by Lampasas county against A. R. Mace, sheriff of said county, and against the Missouri Valley Bridge & Iron Company, to determine the right to certain bridge materials delivered to the contractor, the Hess & Skinner Engineering Company, to be used in the construction of the bridges in controversy. The causes were consolidated by order of the court, to which order no one has objected. W. F. and J. F. Barnes Lumber Company, a corporation, Fox & Mills Hardware Company, a corporation, I. P. Casbeer and W. B. Nichols, composing the firm of Casbeer & Nichols, S. B. Casbeer, W. J. Armstrong, and A. L. Higdon, R. F. Senterfitt, R. B. Senterfitt, and J. H. Andrew, composing the firm of Higdon, Senterfitt, Andrew Company, D. W. Green, and Morris Furniture Company, a firm composed of J. L. Frasier and Roy Morris, intervened and asserted claims as materialmen or laborers. There were other interveners who failed to recover and whose names need not be mentioned. Pending the suit a receiver was appointed by the Sixty-Seventh district court of Tarrant county for the defendant Commonwealth Bonding & Casualty Insurance Company, and the receiver was made a party defendant to the consolidated action. Thereafter the plaintiff, Lampasas county, made par-

⬤⟳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Rehearing denied October 15, 1919.

ties defendant B. F. Allen, Jr., W. P. Dial, E. A. Fancher, C. D. Hill, Bacon Saunders, John Scharbauer, C. C. Taylor, John L. Terrell, C. D. Reimers, and Ben F. Allen, Sr., alleging they were directors of the insolvent Commonwealth Bonding & Casualty Insurance Company, and seeking to recover judgment personally against such individual defendants as copartners, upon the ground that the incorporation of the Commonwealth Bonding & Casualty Insurance Company was irregular and invalid by reason of fraud. The defendants here appealing and others answered by exceptions and pleas raising the issues hereinafter presented. The cause was tried before the court without a jury, resulting in a judgment in favor of the plaintiff against the defendants Hess & Skinner Engineering Company, W. P. Dial, E. A. Fancher, C. D. Hill, Bacon Saunders, John Scharbauer, C. C. Taylor, John L. Terrell, C. D. Reimers, and Ben F. Allen, Sr., in the sum of $7,003.85; in favor of the intervener W. F. and J. F. Barnes Lumber Company, a corporation, against the individual defendants above named for the sum of $1,059.83; in favor of intervener Fox & Mills Hardware Company, a corporation, against said individual defendants in the sum of $274.25; in favor of intervener Casbeer & Nichols against said individual defendants in the sum of $938.00; in favor of intervener H. B. Casbeer against said individual defendants in the sum of $112.50; in favor of intervener W. J. Armstrong against said individual defendants in the sum of $57.08; in favor of intervener Higdon, Senterfitt, Andrew Company against said individual defendants in the sum of $40.65; and in favor of the intervener D. W. Green against said individual defendants in the sum of $92.84. Judgment was entered in favor of the defendants Commonwealth Bonding & Casualty Insurance Company and J. W. Mitchell, receiver for Commonwealth Bonding & Casualty Insurance Company. The judgment likewise finally disposed of the other parties and all issues, the particulars of which are not pertinent to this statement.

"The defendants John Scharbauer, W. P. Dial, E. A. Fancher, C. D. Hill, Bacon Saunders, C. C. Taylor, John L. Terrell, C. D. Reimers, and Ben F. Allen, Sr., filed their motion for a new trial on April 21, 1917, the day on which the above judgment was rendered, and thereafter filed their amended motion for new trial, which said amended motion for new trial was on April 27, 1917, overruled, to which action of the court the defendants named in open court excepted and gave notice of appeal to the Court of Civil Appeals for the Third Supreme Judicial District, at Austin, Tex. The defendants' supersedeas bond on appeal, in the sum of $20,000, was duly filed on May 16, 1917. The trial court made an order granting 90 days from and after the adjournment of court within which to prepare and file the statement of facts, and such statement of facts was made up, signed by counsel for respective parties, approved by the court, and duly filed in the trial court within said order, on, to wit, July 23, 1917, as will appear from the indorsement thereon. Upon the request of the defendants appealing the trial court, on the day of adjournment and after overruling their amended motion for new trial, filed his conclusions of fact and law, to which findings and conclusions the defendants in open court excepted, and again gave their notice of appeal to this honorable court, and to which findings and conclusions the defendants appealing have assigned error herewith presented, as is their right under the rules for the guidance of this court.

"Plaintiff, by its third amended original petition, sought to recover against the defendants John Scharbauer and others appealing herein as sureties upon the following surety bond attached to said pleadings as an exhibit, to wit:

" 'Exhibit B.

" 'Commonwealth Bonding & Casualty Insurance Company.

" 'General Offices, Fort Worth, Texas.

" 'Know all men by these presents that we, Hess & Skinner Engineering Company, a corporation created and existing under the laws of Texas, of Dallas, Texas, as principal, and the Commonwealth Bonding & Casualty Insurance Company, a corporation under the laws of Arizona, with its general offices in the city of Fort Worth, Texas (hereinafter called the company), as surety, are held and firmly bound unto the county commissioners' court of Lampasas county, state of Texas, of Lampasas, Texas (hereinafter called the obligee), in the penal sum of eleven thousand four hundred and ninety dollars ($11,490.00), which sum is hereby agreed to be the maximum liability hereunder, lawful money of the United States of America, well and truly to be paid, for the payment of which we and each of us hereby bind ourselves, our heirs, executors, administrators, and successors, jointly and severally, firmly by these presents. Dated this 26th day of October, 1914.

" 'Whereas, said principal has entered into a certain contract in writing bearing date of October 21, 1914, with the said obligee, for the construction and completion of four bridges in Lampasas county:

" 'No. 1. One over Lampasas river near Kempner. No. 2. One over Sims creek, on Atherton road. No. 3. One over Sims creek, on Hamilton road. No. 4. One over Lucy creek, on Waco road—all according to plans and specifications, as per contract entered into on October 21, 1914, amount of contract being $11,490.00, a copy of which is hereto attached and is hereby referred to and made a part hereof. Now, therefore, the condition of this instrument is such that if the said principal shall well and truly perform the terms and provisions of said contract on the part of said principal required to be performed, then this instrument shall be null and void, otherwise to be and remain in full force and effect: Provided, however, and this instrument is executed by the company as surety upon the following express conditions, which shall be precedent to the right of recovery hereunder.

" '1st. The company shall not be liable for the infringement of any patent or for the validity of any letters patent granted by the United States government concerning any patented article which is required by said contract to be furnished by said principal.

" '2d. The obligee shall, at the times and in the manner specified in said contract, perform all the covenants, matters, and things required to be by the obligee performed; and if the obligee defaults in the performance of any matter or thing in this instrument, or in the said contract agreed or required to be performed by the obligee, the company shall thereupon be relieved from all liability hereunder.

" '3d. If said principal shall in any manner default in the performance of any matter or thing in said contract specified to be by said principal performed, or in the event of said principal abandoning the work provided by said contract to be done by said principal the obligee shall immediately so notify the company, and thereafter the company shall have the right, at its option, to assume and sublet said contract and to proceed thereunder as if no default or abandonment had occurred; and, if the company elect to assume said contract, all moneys agreed therein to be paid said principal, and which at the time of default be due the principal, shall thereupon become payable to the company, and shall be paid to it, anything to the contrary in said contract notwithstanding.

" '4th. If at any time during the prosecution of the work specified in said contract to be performed there come to the notice or knowledge of the obligee the fact that any claim for labor performed or for materials or supplies has been filed or served, the obligee shall withhold payment from the principal of any moneys due or to become due to the principal under said contract until the payment of such claim, or the cancellation and discharge of such lien, or notice of lien, if any, and will so notify the company, giving a statement of the particular facts and amount of each such claim, lien, or notice of lien.

" '5th. If any changes or alterations by the principal and obligee be made in the plans or specifications for the work mentioned in said contract, the obligee shall immediately so notify the company of such changes or alterations, giving a description thereof, and stating the amount of money involved in such changes or alterations: Provided, however, that, when the cost of such changes or alterations shall in the aggregate amount to a sum equal to ten per cent. of the penal sum of this bond, no further changes, or alterations shall be agreed upon by the principal and obligee until the consent of the company shall first be obtained thereto.

" '6th. In the event of the destruction of, or injury to, the work specified in said contract by fire, riot, mob, the elements, earthquake, cyclone, tornado, lightning, public enemy, or any act of God, or through so-called strikes or labor difficulties, neither the principal nor the company shall be liable for any loss or damage whatsoever resulting therefrom.

" '7th. None of the conditions or provisions contained in this instrument shall be deemed waived by the company unless the written consent to such waiver be duly executed by the president or vice president and its seal be thereto affixed, duly attested; nor shall this instrument, or any rights thereunder, be assignable unless with the like consent, duly executed and attested as aforesaid.

" '8th. No action, suit, or proceeding shall be had or maintained against the company on this instrument unless the same be brought or instituted and process served upon the company therein within six months after the time fixed in said contract for the completion of the work therein.

" '9th. All notices and other evidence required by this instrument to be furnished by the obligee to the company shall be in writing, and shall be forwarded by registered letter addressed to the company at its general offices in the city of Fort Worth, Texas.

" 'Hess & Skinner Engineering Company.
" 'By P. M. Skinner. [Seal.]
" 'Commonwealth Bonding & Casualty Insurance Company, By W. C. Van Wyck,
" '[Seal.] Agent and Attorney in Fact.'

"The building contract for the performance of which the foregoing bond was executed, and which was itself also attached as an exhibit to plaintiff's pleading, was as follows:

" 'Exhibit A.
" 'Contract.

" 'Articles of agreement, made this 21st day of October, in the year of our Lord one thousand nine hundred and fourteen, between Hess & Skinner Engineering Company, of Dallas, Texas, party of the first part, and the county commissioners' court of Lampasas county, Texas, party of the second part,

" 'Witnesseth, that the said party of the first part, for the consideration hereinafter mentioned, agrees to furnish all material and to build and construct for the said party of the second part four bridges in Lampasas county:

" '1. (1) over Lampasas river, near Kempner.
" '2. (1) over Sims creek, Atherton road.
" '3. (1) over Sims creek, Hamilton road.
" '4. (1) over Lucy creek, Waco road

—and have the same completed on or before the 1st day of April, A. D. 1915. Said bridges to be completed in accordance with the plan and specification and proposal hereto attached, which are hereby made a part of this contract.

" 'Said party of the second part hereby agrees to pay the said party of the first part, for constructing said bridges the sum of eleven thousand four hundred and ninety dollars ($11,-490.00) in manner following, to wit: 60% of said amount ½ cash, ½ bonds at par and accrued interest, to be paid on delivery of material at the railroad station nearest bridge site, and 25% in bonds upon completion of substructure, and balance when completed, in cash and bonds, payments to be made on each bridge, pro rata of contract price for each bridge to be as follows: Lampasas river, $5,678.40; Sims creek, $3,116.96; Sims creek, $1,918.48; Lucy's creek, $776.16. Work to begin on Lucy creek job within 20 days, and concrete work to continue until completion of four structures; and for the performance of all and every article and agreement above mentioned the said parties do hereby bind themselves, each to the other, firmly by these presents.

" 'It is also agreed that no payments shall be made by the party of the second part, on account of labor performed or material furnished under this contract, to any person or persons without an express order in writing from the principals of the party of the first part.

" 'It is further agreed, by and between the parties hereto, that should the weather or con-

dition of the said stream be such as to preclude the erection of said bridges within the time above specified, or should the same be delayed by the failure of the railroads to transport any portion of the same within such time, or from labor strikes, or from any other cause or causes beyond the control of the said party of the first part, then the time for the fulfillment of this contract shall be extended for a period of not less than that caused by such delay.

" 'It is also agreed that the shape of sections may be changed without reducing area of cross-sections of metal shown on plans.

" 'In witness whereof the parties of the first and second parts have hereunto affixed their hands and seals.

" 'But it is agreed and understood that this contract shall not be binding on the part of the party of the first part unless the bond record is approved by their attorney and to be taken at par and accrued interest.

" 'Signed at Lampasas, Texas, this 21st day of October, 1914.
" 'Hess & Skinner Engineering Company,
" 'James J. Powers.
" 'M. M. White, County Judge.
" 'W. H. Simmons,
" 'J. O. Holley.
" 'M. F. Kirby.
" 'H. C. Townsen.' "

We deem it unnecessary to make further reference to the pleadings other than to say that they were sufficient to support the judgment rendered and to raise the questions presented in this court.

The trial judge's findings of fact are supported by testimony, and read as follows:

"1st. For a better understanding of the conclusions below, I state that cause No. 3218 was instituted on the 1st day of July, 1915, against the Hess & Skinner Engineering Company, hereinafter called the 'Engineering Company,' and the Commonwealth Bonding & Casualty Insurance Company, hereinafter referred to as the 'Bonding Company.'

"Cause No. 3220 was instituted on the 6th day of July, 1915, against A. R. Mace and the Missouri Valley Bridge & Iron Company, hereinafter referred to as the 'Bridge Company.'

"At the September Term, 1915, said causes were consolidated, and thereafterwards, on September 18, 1915, a receiver was appointed for the property and assets of the Commonwealth Bonding & Casualty Insurance Company by the district court of the 67th district of Tarrant county, Tex. Thereafterwards the receiver of said Bonding Company was made a party to said consolidated causes, and afterwards B. F. Allen, Jr., W. P. Dial, E. A. Fancher, C. D. Hill, Bacon Saunders, John Scharbauer, C. C. Taylor, John L. Terrell, C. D. Reimers, and Ben F. Allen, Sr., were by plaintiff made defendants, and who are, hereinafter referred to as the directors of said Bonding Company, and all of whom, except B. F. Allen, Jr., were shown to have been directors thereof, the said B. F. Allen, Jr., having been, through mistake, sued as one of the directors. The interventions.hereinbelow named were filed before said directors of said Bonding Company were made parties.

"2d. That on the 21st day of October, 1914, the said Engineering Company entered into a contract with the county commissioners' court of plaintiff for the constructing of four bridges, a copy of which contract is attached to plaintiff's third amended original petition. On October 26, 1914, said Engineering Company as principal, and said Bonding Company as surety, executed a bond in the sum of $11,490, being the contract price of said four bridges, conditioned for the performance of the terms and provisions of said contract on the part of said principal, a copy of which bond is attached to plaintiff's third amended petition. Said contract and bond provided for the erection by said Engineering Company of four bridges, one over the Lampasas river, near Kempner, one over Sims creek, on Atherton road, one over Sims creek, on Hamilton road, and one over Luce's creek, on Waco road, that over the Lampasas river to be built for $5,678.40, that over Sims creek, on Atherton road, for $3,116.96, that over Sims creek, on Hamilton road, for $1,918.48, that over Luce's creek for $776.16. Payments to be made on each bridge pro rata of contract price therefor, 60% to be paid on delivery of material at nearest bridge sites, 25% on completion of substructure, and balance to be paid on completion of each bridge, respectively.

"3d. That after work had begun on said bridge, and on January 12, 1915, the plans and specifications of the Luce's creek bridge were changed so as to make such bridge 100 feet long instead of a 40-foot low-water bridge, and for which the plaintiff agreed to pay said Engineering Company the sum of $861 over and above the said contract price therefor; and which sum, after the completion of said Luce's creek bridge, together with the amount of contract price, was paid by plaintiff to said Engineering Company. At the time said change in plans and specifications in the Luce's creek bridge was made the plaintiff, on January 15, 1915, notified said Bonding Company of such changes, and the cost thereof, as required by said bond, and by letters thereafterwards from said Bonding Company to plaintiff it recognized said contract and bond as being still in force, which letters were written at various times after said January 15, 1915, and before the institution of this suit; that said changes in the specifications of said bridge were authorized by the provisions and terms of said bond, and did not exceed in value ten per centum of the amount of said bond, that said bridge was completed in accordance with said changed specifications, was accepted and paid for in full by the plaintiff prior to the 20th day of May, A. D. 1915.

"4th. That about the 20th day of May, 1915, the Engineering Company abandoned work on said three other bridges, notifying the plaintiff of such abandonment, and thereafterwards did no other work thereon, and left said three other bridges uncompleted; that the said Bonding Company was immediately notified by plaintiff of such abandonment and noncompletion of said three bridges.

"5th. That prior to such abandonment of work on said three bridges the plaintiff had paid to said Engineering Company on account of same the sum of eight thousand six hundred and twenty-five dollars and $85/100 ($8,625.85), the payments being made at various times and in various amounts, as authorized and required by said contract and bond. The payment on

said three uncompleted bridges being not over 85% of the contract price therefor; that not over 85% was paid on the Luce's creek bridge until after it was completed; that only 60% was paid on the Sims creek bridge on the Atherton road.

"6th. That after such abandonment, and until about the —— day of ——, 1916, the plaintiff did not have on hand money to complete said bridges, but between said last-named date and the 1st day of March, 1917, the county had said bridges completed according to plans and specifications referred to in said contract, the cost to plaintiff of such completion being nine thousand one hundred and fifteen and $85/100$ ($9,115.85) dollars, which was a reasonable sum for such completion.

"7th. That notice of the pendency of said causes Nos. 3218 and 3220 was given by publication in the Lampasas Leader, a newspaper of general circulation, in said Lampasas county, Tex., for at least three successive weeks, as required by law.

"8th. That the rise in the Lampasas river by which the bridge known as the Kempner bridge was thrown or washed down was not an unusual rise, but was a rise not uncommon; that at said time said bridge was approximately three-fourths (¾) completed.

"9th. That the amounts paid by plaintiff to said Engineering Company on account of construction of said three bridges (being the bridges named in said contract other than said Luce's creek bridge), together with the amounts to be paid for the completion thereof, exceeded the contract price therefor to the extent of seven thousand and three and $85/100$ ($7,003.85) dollars, or a few dollars more, and the said Engineering Company has been actually and notoriously insolvent since and before the institution of this suit.

"10th. That Casbeer & Nichols, a firm composed of I. P. Casbeer and W. B. Nichols, in accordance with a contract theretofore made with said Engineering Company, did certain labor in the building of said three bridges, and excavating for the piers thereof, which work was necessary to be done in the construction of same, and for which labor said Engineering Company is indebted to them in the sum of nine hundred and thirty-eight ($938.00) dollars.

"11th. That the intervener H. B. Casbeer, under a contract with said Engineering Company, hauling material from the railway depot to the bridge sites of said three bridges, which labor was necessary to the construction of said three bridges, and for which there is due said H. B. Casbeer the sum of one hundred and twelve and $50/100$ ($112.50) dollars.

"12th. That the intervener, the Fox & Mills Hardware Company, a corporation, furnished the material described in their account filed herein to said Engineering Company at the instance and request of said Engineering Company, which material was used by said Engineering Company in said three bridges, and that the reasonable value of said material, and which is still due and unpaid from said Engineering Company to said Fox & Mills Hardware Company, is two hundred and seventy-four and $25/100$ ($274.25) dollars.

"13th. That the intervener, W. J. Armstrong, holds time checks issued by said Engineering Company for labor performed upon said three bridges, said time checks having been issued to other persons, and, by them assigned to said W. J. Armstrong, the amount due and unpaid thereon being fifty-seven and $8/100$ ($57.08) dollars.

"14th. That the intervener Higdon-Senterfitt-Andrew Company holds similar time checks unpaid, which time checks were issued to other persons, and assigned to said Higdon-Senterfitt-Andrew Company, the amount due and unpaid thereon amounting to forty and $65/100$ ($40.65) dollars.

"15th. That the intervener D. W. Green, under the employment of said Engineering Company, performed labor in the construction of said three bridges, for which there is due him by said Engineering Company the sum of ninety-two and $84/100$ ($92.84) dollars.

"16th. The intervener W. F. & J. F. Barnes Lumber Company, a corporation, in accordance with a contract theretofore made with said Engineering Company, furnished certain material for the construction of said three bridges, which material was necessary for and was used in the construction of same, said material being shown in the account of said Lumber Company filed herein, and for which the said Engineering Company is indebted to said W. F. & J. F. Barnes Lumber Company in the sum of one thousand and fifty-nine and $83/100$ ($1,059.83) dollars.

"17th. That during the year 1910, and until about March 20, 1911, the promoters and subscribers for stock in said Bonding Company contemplated that a charter for said company should be obtained in the state of Texas and under its laws; that prior to the last-named date a preliminary organization of said Bonding Company had been formed, and on that date it was determined, at a meeting held at Ft. Worth, Tex., of the members of said preliminary organization, and of those who had subscribed for stock, that the Bonding Company should be incorporated in and under the laws of the territory of Arizona, and in accordance with such determination a charter was obtained from the territory of Arizona incorporating said company under the laws of Arizona, the charter being the same as is shown by a copy thereof attached to plaintiff's third amended original petition, which charter provided for a capital stock of three hundred thousand dollars, and which was granted and dated on March 23, 1911; that said Bonding Company was incorporated under the laws of Arizona because payment for stock subscribed was not, under the laws of Arizona, required to be made in cash or labor done or property actually received, as was required under the Constitution and laws of Texas, and because under the Arizona charter the company could perform and do more different kinds of insurance than could be done under a charter obtained in and under the laws of Texas.

"18th. That the laws of Arizona in force when said charter was granted were the laws as shown by the Revised Statutes of Arizona of the year 1901.

"On page 306, article 765, of the Revised Statutes of Arizona of 1901, among the powers granted to corporate bodies is the power 'to exempt the private property of members from liability for corporate debts.'

"By section 766, page 307, of said Revised

Statutes, it is provided that articles of incorporation must contain 'the name of the corporators, the name of the corporation, and its principal place of transacting business.'

"Article 789, page 311, of said Revised Statutes, under the head of 'Insurance Corporation,' is as follows:

" 'No corporation shall be formed for the transaction of business in any kind of insurance except on live stock, without a subscribed capital equal to at least one hundred thousand dollars in United States gold coin, twenty-five per cent. whereof must be paid in previous to the issue of any policy, and the remainder by monthly or quarterly installments within twelve months from the day of filing the articles of incorporation. Nor shall any individual or person transact business as agent of any nonresident person or corporation, whether foreign or domestic, in any kind of insurance, except on live stock, unless such person or corporation possesses available cash assets, exclusive of stock notes, to the amount of at least one hundred thousand dollars in United States gold coin over and above all liabilities.'

"Article 769, page 307, of said Revised Statutes relating to 'Corporations in General,' is as follows:

" 'The corporation may commence business as soon as its articles of incorporation are filed for record in the office of the county recorder, and a certified copy with the secretary of the territory, and its acts shall then be valid, if the publication is made and an affidavit thereof filed in the office of the secretary of the territory within three months from the date of the filing with the county recorder.'

"Said Revised Statutes of Arizona of 1901 remained in force until the adoption of the Revised Statutes of 1913, by the state of Arizona.

"Article 3399, page 1160, of the 1913 Revision of the Revised Statutes of Arizona, is as follows:

" 'Every insurance company before transacting any business of insurance in this state, must own, have and possess in its own exclusive name and right, paid up, unimpaired capital, if a stock company; or must own, have and possess, in its own exclusive name or right, net assets unimpaired, of the kind required by this act, if it be a mutual company, fully equal to the minimum amount of capital paid up in cash or assets required by the provisions of this act to entitle any insurance company to be authorized to transact like business. No part of said capital or assets shall consist of the capital stock, investments, property or assets of any other insurance company or organization, nor shall such capital or assets include any sum or thing of value not acquired, produced or earned and owned exclusively by such company in its own right; provided: That each alien insurance company admitted to do business in this state shall not transact any business of insurance in this state, unless it shall have within the United States deposited with insurance departments not less than two hundred thousand dollars invested in like manner as the capital of a similar domestic insurance company is required to be invested.'

"Article 3424, page 1173, of the Arizona Revised Statutes, provides that no fidelity or surety company shall make insurance in the state of Arizona without having a capital stock fully paid of at least two hundred thousand dollars, and a surplus of not less than fifty thousand dollars.

"19th. That at and before the granting of said charter it was intended by the subscribers to the stock of said Bonding Company and the members of the preliminary organization thereof that the meetings of the stockholders thereof should be held at the city of Fort Worth, Tex., and that its principal place of business should be at said city.

"20th. That since said charter was granted, and up to the time of the institution of this suit, the directors of said Bonding Company, and practically all of its stockholders, have resided in the state of Texas, its principal place of business has been at said city of Fort Worth, where its organization meeting was held, and where all the meetings of its stockholders and directors have been held, such directors having been elected at such stockholders' meetings. The acting directors of said Bonding Company at the time of the execution of the bond sued on in this cause were the defendants W. P. Dial, E. A. Fancher, C. D. Hill, Bacon Saunders, John Scharbauer, C. C. Taylor, John L. Terrell, C. D. Reimers, and Ben F. Allen, Sr. The said Scharbauer was a director of said Bonding Company from the time of the organization of the company, others of defendants were stockholders in said company from the time of such pretended organization, and others have become stockholders since such pretended organization, and the organization meeting having been held on March 31, 1911.

"21st. That in payment for subscriptions to capital stock issued to them the subscribers paid but a small amount in money or labor done or property which was actually received by said Bonding Company, but the subscribers to whom stock was issued executed their notes therefor to the Bonding Company for the balance of the amounts subscribed. At the time of the pretended organization of the company and until after it had commenced business the amount of the capital stock that had been paid to it in money, labor, and property did not exceed from fifteen to seventeen thousand dollars, and the proof does not show that thereafterwards any further sums were paid on capital stock, but does show that certain notes executed by the stockholders were used in the purchase of Dallas city bonds of the value of fifty thousand dollars, or that such notes were sold for cash, which was invested in such bonds. The said company never at any time possessed available cash assets, exclusive of stock notes to the amount of one hundred thousand dollars, in United States gold coin, over and above all liabilities.

"22d. That said Bonding Company about the ―― day of ――, 1911, deposited with the state treasurer of the state of Texas notes given by said stockholders in payment of capital stock of the face value of one hundred and fifty thousand dollars, and deposited other of said notes with the insurance or other departments of Arizona and California, where the company was doing business through agents.

"23d. That soon after its organization the said Bonding Company, through its directors, filed in the office of the Commissioner of insurance and banking of Texas its report of its condition as required, and thereafterwards filed

annually similar reports, and upon the filing of such reports, or in a reasonable time after each of said reports was filed, permits were issued to said Bonding Company authorizing it to transact insurance business in the state of Texas; that in each of said reports, all of which were sworn to by its officers, it was stated that the amount of the capital stock of said Bonding Company paid up in cash was three hundred thousand dollars, which statement was false and untrue.

"24th. That at the time said reports were made the persons making them believed them to be true, and that they believed said capital stock to be paid up in full where the subscribers had executed their notes therefor, and the directors were never informed or believed that the capital stock issued and notes given therefor were invalid until a short time before a receiver was, on September 19, 1915, appointed for the assets and properties of said Bonding Company in Texas.

"25th. That at the time the bond herein sued on was presented to and approved by the plaintiff's commissioners' court such court had never seen the charter of said Bonding Company, nor the permits issued authorizing it to transact business in Texas; it knew nothing of any facts invalidating such charter, the organization of such company, or its permit, but merely relied upon the fact that said company purported to be a corporation and to have a permit to transact business in Texas, and upon advertisements of said company that had been seen by said commissioners' court the interveners relied upon the same facts.

"26th. That about the 16th day of December, 1914, the said Missouri Valley Bridge & Iron Company sold to said Hess & Skinner Engineering Company, to be used in the construction of said three bridges, a large amount of iron and steel bridge material, of the value then and ever since of five thousand two hundred and sixty-three and $85/100$ dollars, which bridge material was shipped by said Bridge Company to said Engineering Company to the railroad stations nearest to the said respective bridges; that the same was transported by said Engineering Company to the respective bridge sites, and there placed at the three bridge sites at different times on or before March 16, 1915, and at the times the same were so placed at said bridge sites the plaintiff paid to said Engineering Company 60% of the contract price for said bridges, in accordance with the terms of the original contract referred to in paragraph 2 hereof, the aggregate amount so then paid to said Engineering Company being six thousand four hundred and twenty-eight dollars.

"27th. That on or about one of the times when said payments referred to in the last preceding paragraph hereof the county judge, acting for the commissioners' court of plaintiff county, hesitated about making said payment, fearing that said Engineering Company might fail to complete said bridges in accordance with its contract, inquired of the agent of the Engineering Company as to how the county would be protected in said payments, and said agent, when demanded the payment of 60% of the contract price, after placing said material on the ground at the bridge sites, declared to the said county judge that said 'material was the property of the plaintiff,' whereupon the said county judge made payment to said agent of the Engineering Company in accordance with said written contract; that said declaration of said agent was a mere expression of opinion or a legal conclusion, or his construction of said written contract, and that the payment by the plaintiff did not make a new or supplemental contract, or in any way alter or change the original written contract between the parties.

"28th. That on June 14, 1915, the Missouri Valley Bridge & Iron Company, a corporation, filed in the Forty-Fourth district court of Dallas county, Tex., suit being cause No. 20153B on the docket of said court, against the Hess & Skinner Engineering Company, its petition for the cancellation of the contract of sale of said structural steel and metal sold by the Missouri Valley Bridge & Iron Company to said Engineering Company, to be used in said three bridges in Lampasas county, on the ground that said sale was induced by fraud, and at the same time there was filed in the district court of Dallas county, Tex., an affidavit and bond for writ of sequestration, and upon said application there was issued out of the Dallas county court a writ of sequestration directed to the sheriff or any constable of Lampasas county, Tex., commanding him to take into his possession the property therein described, to wit, the structural steel and metal sold and delivered by Missouri Valley Bridge & Iron Company to said Hess & Skinner Engineering Company on said three uncompleted bridges, then situated at said bridge sites, but not used or ever became a part of any of said bridges; that the defendant A. R. Mace, sheriff of Lampasas county, executed said writ and took into his possession said property; that the plaintiff was not a party to said suit.

"29th. That on August 25, 1915, entered as of July 24, 1915, judgment was rendered in the Forty-Fourth district court of Dallas county, in the case of Missouri Valley Bridge & Iron Company against Hess & Skinner Engineering Company, No. 20138B, for plaintiff, canceling said contract of sale, and an order was directed to the sheriff of Lampasas county to turn over and deliver to the said Missouri Valley Bridge & Iron Company all of said property held by him under said writ of sequestration; that on the 6th day of July, 1915, Lampasas county, plaintiff herein, filed this suit against the Missouri Valley Bridge & Iron Company and A. R. Mace, sheriff of Lampasas county, for the conversion of said property so seized by the sheriff of Lampasas county, under the writ of sequestration, issued out of the district court of Dallas county for the value of said material, which I have found to be in the sum of $5,263.85, claiming that it was the owner of said property, or, if not the owner, that it was entitled to a lien thereon.

"30th. That the plaintiff contracted with said Engineering Company for completed bridges; that it agreed to pay for the same in the manner and at the times specified in said written contract hereinbefore stated; that it did not advance to said Engineering Company any money with which to pay for said structural steel or any material; that it did not purchase any of said material from said Engineering Company; that the plaintiff never at any time came into possession of said structural steel and ma-

terial intended by said Engineering Company to be used in said three unconstructed or uncompleted bridges; that it acquired no ownership in or to the same, or any part thereof; and that it acquired no lien thereon."

## Opinion.

[1] Under appellants' first and second assignments of error counsel for them present two contentions, which are, first, that Lampasas county, having contracted with Commonwealth Bonding & Casualty Insurance Company as a corporation, and having accepted the obligation and bond of that company, is estopped by that instrument to deny the validity of the incorporation of that company, and is also estopped to recover against appellants as copartners or individuals; and, second, that as the testimony shows that the Commonwealth Bonding & Casualty Insurance Company received a charter from the territory of Arizona, regular upon its face, and received from the state of Texas a regular permit to transact business as a corporation in the state of Texas, the judgment of the trial court, permitting a recovery against the directors of that company as copartners or individuals, constitutes a collateral attack upon the validity of the incorporation of that company, and is therefore erroneous.

Replying to those propositions, counsel for Lampasas county submit the following proposition:

"The plaintiff alleged facts showing that the charter of the Commonwealth Bonding & Casualty Insurance Company was obtained in the territory of Arizona, in fraud of the laws thereof, and in fraud of and to evade the laws of the state of Texas, and without any intention on the part of its incorporators that its corporate functions should be performed in Arizona, but with the intention that they should be performed in the state of Texas; plaintiff further alleged that the organization meeting and all other meetings of the stockholders of said company were held at Ft. Worth, in the state of Texas, where all of its corporate business was transacted, and where its principal office was maintained; that less than twenty-five per cent. of the capital stock of said company was paid up before the issuance of any policy by it, or within twelve months from the time of its attempted incorporation, as required by the laws of Arizona, and less than twenty-five per cent. thereof was paid up before the execution of the bond sued on; plaintiff further alleged that in each of the years 1911, 1912, 1913, 1914, and 1915 the acting officers of said company filed in the office of the commissioner of insurance and banking of the state of Texas affidavits representing and stating that said company then had an actual capital stock of three hundred thousand dollars paid up in cash, when in fact it at no time had a paid up in cash capital stock of as much as seventy-five thousand dollars; that said affidavits were fraudulently made, for the purpose of obtaining permits to do business in Texas, and on the filing of same such permits were issued to it. Plaintiff further alleged and proved that it did not learn of said facts until after the April term, 1916, of the district court of Lampasas county. The plaintiff was therefore not estopped from proving or relying on said facts, and, the same being proved, the court did not err in rendering judgment against the appellants."

The question presented by these conflicting contentions is one of great importance, and as appellants in their brief, in addition to many decisions cited and relied upon, have invoked and claimed protection under article 1138 of the Revised Statutes of this state, and as that statute has been construed by the Court of Civil Appeals at San Antonio in Davis v. Allison, 189 S. W. 968, and as that case was pending in the Supreme Court upon writ of error, final disposition of this case has been held up to await the Supreme Court's construction of that statute. That court has recently decided the case referred to, and its construction does not support appellants' contention, but, on the contrary, seems to be against them. Furthermore, we have reached the conclusion that article 1138 has no application to this case. It reads:

"No person who assumes an obligation to an ostensible corporation, as such, shall resist the enforcement of such obligation, on the ground that there was in fact no such corporation, until that fact shall have been judged in a direct proceeding had for the purpose."

As we construe the language of that statute, it is limited to cases in which suit is brought upon an obligation to an ostensible corporation, in which class of cases the statute, in substance, declares that the defendant shall not "resist the enforcement of such obligation on the ground that there was in fact no such corporation," etc. In this case it is not the defendant, but the plaintiff, who is attacking the validity of the alleged corporation, for the purpose of showing that its board of directors should be held individually liable to the plaintiff; and it is not the Commonwealth Bonding & Casualty Insurance Company that is complaining in this court of the judgment holding it to be an unlawful corporation, but the individuals who constituted its board of directors at the time of the execution of the bond sued on. According to our construction of the statute, these facts do not bring the case within its purview.

Counsel for appellants have cited numerous authorities, and counsel for appellees concede that the general rule is as contended on behalf of appellants and supported by the authorities referred to; but it is contended on behalf of appellees that there are well established exceptions or limitations to the rule, and that the instant case falls within the latter class.

One of the exceptions seems to be that where a charter is obtained in one state,

with a fixed purpose not to transact any business in that state, such conduct is a fraud upon the state granting the charter, as well as upon the state in which it is sought to organize and operate the corporation; and in that class of cases it has been held that a person dealing with the alleged corporation as such is not estopped from denying the existence of the corporation, if at the time of the transaction involved he had no notice of the fraud in obtaining the charter. Some of the authorities cited on behalf of appellant, and especially Demarest v. Flack, 128 N. Y. 205, 28 N. E. 645, 13 L. R. A. 854, seem to support a contrary doctrine.

Judge Thompson, in his work on Corporations, vol. 6, § 7895, criticises the New York case just referred to, and, after briefly stating the facts, says:

"In such a case is the law to be corrupted and perverted in favor of such manipulation, so far as to hold that the citizens of a state can be allowed to acquire a corporate existence within that state, under, subject to, and governed by, the laws of another state? To put it another way, can the citizens of New York be allowed to import the laws of West Virginia governing private corporations into the state of New York, and make those laws the rules of their own government in dealing with other citizens of New York, and will the courts of New York gravely sanction such frauds upon its own laws? * * * When it is considered that a corporation is, for the purposes of federal jurisdiction, conclusively presumed to be a 'citizen' of the state under whose laws it is created, will the citizens of one state be permitted, by becoming thus incorporated under the laws of another state, to defraud the courts of their own state out of their rightful jurisdiction over controversies between them and other citizens of their own state, where the amount in controversy exceeds two thousand dollars? These questions, to the mind of the writer, answer themselves. The conclusion is that the 'tramp corporation' should not be judicially recognized, but that its members should be held liable upon their contracts as partners, and upon their torts as joint tort-feasors. Undoubtedly the question is to be determined as a question of comity; for, considered as a question of mere power, one state cannot send any portion of its laws into another state, and make them operative there, whether on the backs of a pretended migrating corporation or otherwise."

And in section 7896 that author, citing many authorities, says:

"But other courts have taken the view that, irrespective of the residence or citizenship of its members, the organization under the law of one state of a corporation for the purpose of doing business exclusively in another state is a fraud upon the laws of the latter state, and that such persons will not be deemed possessed of any of the immunities of a corporation in the latter state, but will be liable for their undertakings as partners."

Some of the authorities cited by appellants either expressly recognize the exceptions to the rule contended for by appellees or leave the question open. Upon that subject we copy with approval from appellees' brief, as follows:

"In American Salt Co. v. Heidenheimer, 80 Tex. 344 [15 S. W. 1038, 26 Am. St. Rep. 743], cited by appellants, the court, after stating the general rule of estoppel, says: 'Whether that rule ought to be applied in a case in which the corporators have knowingly and intentionally violated the law in procuring a charter under a general law we need not decide.' In that case the charter was obtained in Texas.

"In Davis v. Allison, 189 S. W. 968, cited by appellants, the court approves the case of Jones v. Aspen Hardware Co., 21 Colo. 263, 40 Pac. 457 [29 L. R. A. 143], 52 Am. St. Rep. 220, and says that the law is sufficiently expressed therein in language as follows: 'It is also well settled that to constitute a de facto corporation there must be either a charter, or a law authorizing the creation of such a corporation, with an attempt in good faith to comply with its terms, and also a user,' etc. In a note to the Colorado case, last referred to, it is said, citing authorities, that a party to a contract with a pretended corporation, organized without law, or under an unconstitutional one, is not estopped to deny its existence at the date of the contract.

"In Owensboro Wagon Co. v. Bliss, 132 Ala. 253 [31 South. 81], 90 Am. St. Rep. 907, cited by appellants, after referring to the facts and stating the general rule as to estoppel, the court said: 'It is too plain for controversy that a corporation de facto was thus created, there being no allegation or evidence of fraud on the part of defendants and associates.' The defendants were those sought to be made liable as partners.

"In Shields v. Clifton Land Co. [94 Tenn. 123], 28 S. W. 668 [26 L. R. A. 509, 45 Am. St. Rep. 700], cited by appellants as supporting said general rule, the court said: 'There can be no doubt that persons assuming to act under a charter invalid because some positive requirement of the law has not been complied with are liable as individuals for all debts contracted by them in the name of such corporation.' This case supports our contention that there can be no estoppel in this case merely because of the appellee's contract with the corporation, as such, in ignorance of the facts which show the corporation to have been created contrary to law.

"In Snider Sons Co. v. Troy, 91 Ala. 224 [8 South. 658, 11 L. R. A. 515], 24 Am. St. Rep. 887, cited and extensively quoted from by appellants, it was held that a creditor who has contracted with a de facto corporation in its corporate capacity is estopped to deny its corporate existence, and cannot charge its shareholders as partners with a corporate debt, in the absence of fraud.

"In Harrell v. Davis, 168 Fed. 187 [94 C. C. A. 47, 22 L. R. A. (N. S.) 1153], cited by appellants, it was said: 'Parties who actively engage in business for profit under the name of a corporation, which they know neither exists nor has any color of existence, may not escape individual liability because strangers are led by their pretense to contract with their pretended entity as a corporation.' The court further said that color of legal organization as a corporation under some charter or law, and user of the sup-

posed corporate franchise in good faith, are indispensable to such exemption from personal liability. Such being the law, it would necessarily follow that the general rule as to estoppel above referred to would not prevail in such a case.

"In Christian, etc., Co. v. Fruitdale Lumber Co. [121 Ala. 340], 25 South. 567, cited by appellants, the court states the general rule as hereinbefore stated, and said: 'Where there is no bona fide purpose and effort to organize a real corporation with a capital to respond to its liability, * * * the pretended existence of a corporation is open to collateral attack as a mere fraudulent device, and, though on the face of the proceedings there is a regular and complete incorporation, the pretended corporate entity is to be taken as nonexistent except as to persons who may have contracted with it as a corporation in such way as to estop themselves to show fraud.' The appellee in this case has done nothing to estop itself, as it was entirely ignorant of the facts constituting the fraud.

"In Marshall on Corporations (cited by appellants) it is said in section 40, p. 131, that one who contracts with an association as a corporation thereby admits its incorporation, and is estopped to deny its corporate existence, unless, because of fraud or some other reason, it would be inequitable to apply the doctrine of estoppel. On page 137 the same author says that the doctrine of estoppel originates in equitable principles, and therefore it does not apply when it would be inequitable to apply it, or when equitable principles do not require its application, as in the case of fraud.

"The appellants cite, as sustaining the general rule above referred to, Cook on Corporations (6th Ed.) vol. 1, § 234; but in sections 239 and 240 of the same volume it is said: 'There is a limit beyond which the courts will not go in recognizing the validity of foreign corporations. In order that contracts may be upheld, and the corporate character be sustained, it is necessary that both the state creating the corporation and the corporation so created shall have acted in good faith in conferring and taking the corporate privilege.' It cannot be said in this case that the promoters and organizers acted in good faith, when the proof showed, as found by the court, that the company was incorporated under the laws of Arizona because payment for stock subscribed was not, under the laws of that state, required to be made in cash or labor or property actually received, as required under the Constitution and laws of Texas, and because under an Arizona charter the company could perform and do more different kinds of insurance than could be done under a charter obtained in and under the laws of Texas. No equitable principle would require the application of the doctrine of estoppel under such circumstances where the appellee at the time of the acceptance of the bond was ignorant of the fraud of appellees and others upon the laws of Texas in obtaining the charter in Arizona.

"In Brennan v. Weatherford, 53 Tex. 331 [37 Am. Rep. 758], cited by appellants, it was held that the existence of a municipal corporation could not be attacked collaterally, the municipal corporation having existed for twenty years. The court said: 'A more liberal rule of construction is allowed in favor of public charters granted for the general good than in private charters for individual gain.' No question of fraud was involved in that case, but there was involved only a slight irregularity in the proceedings resulting in the incorporation.

"Parks v. West, 102 Tex. 11 [111 S. W. 726], cited by appellants, does not sustain their position. In that case a collateral attack on the existence of a municipal corporation was sustained, and, under the reasoning in the opinion in that case, a collateral attack would be sustained in this case.

"In Laflin v. Sinsheimer, [46 Md. 315], 24 Am. Rep. 525, cited by appellants, the court followed the general rule. There was in that case merely irregularities in the formation of the corporation; the question of fraud in obtaining its charter, or invalidity of its organization, was not involved.

"The case of First National Bank v. Rockefeller [195 Mo. 15], 93 S. W. 761, cited by appellants, seems in certain respects to sustain their position. The principal attack (made collaterally) on the existence of the corporation was on the ground that the stock subscribed for, and stated to have been paid for, had not in fact been paid for at the time the charter was obtained, and that therefore the charter had been fraudulently obtained. The charter of the corporation was obtained in Missouri. It was held that a demurrer was properly sustained to a petition stating those facts, the court stating that it did not appear that the stock had not been paid for since the charter was granted. In this respect that case differs from the case under consideration. The court in that case distinguishes it from the case of Cleaton v. Emery, which we hereinafter refer to, saying in regard thereto [195 Mo. on page 56], 93 S. W. on page 772, as follows: 'The cases of Cleaton v. Emery, 49 Mo. App. 345, and Davidson v. Hobson, 59 Mo. App. 130, were cases arising under the doctrine of the comity of states, and because in each case the corporations were clearly organized in fraud of our laws the Court of Appeals held that they were not entitled to be recognized as such under the laws of this state. In both of those cases it was clearly the purpose of the incorporators to violate the laws of this state, and not only that, in the Cleaton Case the corporation was not formed in compliance with the laws of Colorado, and therefore the court refused to recognize the validity of such corporation, saying "that the sole purpose was to avoid the restrictions so wisely ingrafted on our corporation law." Neither of those decisions, however, have any bearing upon the questions arising upon this record, and neither is any authority for holding the defendants under the allegations of the petition in this case as copartners.'

"The case now under consideration is, in many of its features, very similar to the case of Cleaton v. Emery.

"In Panhandle Packing Co. v. Strongfellow, 180 S. W. 145, and Medlin v. Commonwealth Bonding & Casualty Insurance Co., 180 S. W. 899, both cited by appellants, it was held that the existence of a corporation cannot be attacked collaterally by a stockholder in a suit for payment of stock subscriptions, where he had participated in the organization of the corporation. It has been frequently held that a stockholder occupies a different position from that of a creditor in attacking the validity of a corporation,

especially where the stockholder has participated in the organization or management of the corporation."

In support of their contention and the ruling of the trial court, counsel for appellee Lampasas county have cited the following authorities, the most of which have been examined and found to have some material bearing upon the question under consideration: Empire Mills v. Alston Grocery Co. (App.) 15 S. W. 507; Bank of De Soto v. Reed, 50 Tex. Civ. App. 102, 109 S. W. 256; Detroit Electrical Works v. Riverside Street Ry. Co., 29 S. W. 412; Franco-Tex. Land Co. v Laigle, 59 Tex. 343; Lehigh Min. & Mfg. Co. v. Kelly, 160 U. S. 327, 16 Sup. Ct. 307, 40 L. Ed. 444; Hequembourg v. Edwards (Mo.) 56 S. W. 490; Cleaton v. Emery, 49 Mo. App. 349; Journal Co. v. Nelson, 133 Mo. App. 482, 113 S. W. 690; Hyatt v. Van Riper, 105 Mo. App. 664, 78 S. W. 1043; Kaiser v. Lawrence State Bank, 56 Iowa, 104, 8 N. W. 772, 41 Am. Rep. 85; Farmers' Co-Operation Trust Co. v. Floyd, 47 Ohio St. 525, 26 N. E. 110, 12 L. R. A. 346, 21 Am. St. Rep. 846; Duke v. Taylor, 37 Fla. 64, 19 South. 172, 31 L. R. A. 484, 53 Am. St. Rep. 232; Meyer v. Brunson, 104 S. C. 84, 88 S. E. 359; Wonderly v. Booth, 36 N. J. Law, 250; 1 Thompson on Corporations, §§ 218, 219, 508, 525, 694, 696; 3 Thompson on Corporations, § 3370; 7 Thompson on Corporations, §§ 8210, 8211, 8213, 8450, 8210; 10 Cyc. 248, 261, 838, 839, 230, 248; Cook on Stockholders (2d Ed.) 232, 234, 239, 240; 6 Thompson on Corporations, §§ 7895 and 7896; 4 Thompson on Corporations, § 5685.

We shall not undertake to review, nor to even quote, from many of the authorities just referred to, but will refer specifically to a few of them.

In Franco-Tex. Land Co. v. Laigle, 59 Tex. 343, our Supreme Court, speaking through Chief Justice Willie, said:

"A private corporation, whose charter has been granted by one state, cannot hold meetings or pass votes, or have any legal existence, in another state. It must dwell in the place of its creation, and cannot migrate to another sovereignty. Bank of Augusta v. Earle, 13 Pet. 519 [10 L. Ed. 274]; Miller v. Ewer, 27 Me. 509 [46 Am. Dec. 619]; Aspinwall v. O. & M. R. R. Co., 20 Ind. 497 [83 Am. Dec. 329].

"This prohibition as to the performance of acts, outside of the state where chartered, refers to acts of a strictly corporate character, such as must be discharged by the corporators themselves, such as the original organization, the election of directors, etc. The better opinion is that the mere transaction of such business as is usually done by the directors or other agents of the body may be done as well without the state as within it. Bellows v. Todd, 39 Iowa, 209; Arms v. Conant, 36 Vt. 745; Gal. v. R. R. Co., 11 Wall. 476, 477 [20 L. Ed. 199]."

In Detroit Electrical Wks. v. Riverside Street Ry. Co., 29 S. W. 412, there was a collateral attack on the validity of the charter of a pretended corporation; suit was brought against the stockholders to recover an indebtedness incurred in the name of the company. In passing upon a demurrer the court held that upon the facts alleged the plaintiffs were entitled to recover.

In Smith v. Ry. Co., 105 S. W. 529, the plaintiff made a collateral attack upon the validity of the incorporation of the Richmond Transportation Company, and the intermediate court held that the organization of the company was not undertaken in good faith, and the Supreme Court said:

"The Court of Civil Appeals held, and perhaps correctly, that the Richmond Transportation Company was not a corporation." 101 Tex. 408, 108 S. W. 820.

In Bank of De Soto v. Reed, 50 Tex. Civ. App. 102, 109 S. W. 256, there was a collateral attack on the validity of the incorporation of the Beaumont-Port Arthur Company. The suit was by a creditor against stockholders. The court sustained the action, and held the stockholders liable, although they believed that everything had been done that was necessary to create a corporation.

Cleaton v. Emery, 49 Mo. App. 349, was an action against stockholders of a corporation to recover for debt incurred by the alleged corporation. The defendants averred that the plaintiff was estopped from questioning the legality of the corporate existence with which he dealt. That contention was overruled, and, it being shown that the corporation was created under the laws of Colorado to evade the restrictions of the laws of Missouri, the incorporation was held to be absolutely void, though all the proceedings were regular on their face, and that the plaintiff was entitled to recover of the stockholders.

In Hyatt v. Van Riper, 105 Mo. App. 664, 78 S. W. 1043, the court cited with approval the case of Cleaton v. Emery.

In Journal Co. v. Nelson, 133 Mo. App. 482, 113 S. W. 690, it was held that the plaintiff had a right to maintain an action against the defendants as officers of the pretended corporation for a debt incurred in the name of such pretended corporation, upon a showing that it was incorporated under the laws of Arizona for the purpose of doing business in Colorado, and that, for reasons alleged, the incorporation was a fraud on both states.

In Farmers' Co-operative Trust Co. v. Floyd, 47 Ohio St. 525, 26 N. E. 110, 12 L. R. A. 346, 21 Am. St. Rep. 846, the plaintiff sought to recover from the directors of an acting corporation for indebtedness contracted in the name of the corporation, alleging that it was illegally organized. The defendants made the contention that the plaintiff was estopped on account of his dealing with a corporation, but it was held that there was no estoppel.

In 1 Thompson on Corporations, § 218, it is said that essential distinctions exist, in respect of the question when a corporation is deemed to be in existence, between cases where the action is against the corporation itself, and cases where it is against one of the supposed corporators to charge him personally upon a contract entered into in the name of the supposed corporation; and the author states that in the latter class of cases, if it be shown that the corporation has no legal existence, the defendants will ordinarily be held liable as partners.

In 7 Thompson on Corporations, § 8211, it is said that—

"in a contest between individuals it has been held that where persons attempt to organize a corporation, but go no further than to file articles of incorporation in the office of the secretary of state, and then, without raising the capital stock which the law requires, incur debts in the name of the corporation, the persons so proceeding are answerable for such debts as partners. The decision is perfectly sound, and it is not necessary to recur to the question whether such a body is a corporation de facto or de jure to vindicate it; nor is there any principle of estoppel which will cut off the remedy of the creditor against the members of such a body, unless he has given credit to the body with full knowledge of the facts."

From these and other authorities, as well as upon principle and public policy, we hold that the ruling of the trial court, and the contention of appellees in support thereof, are sound and correct; and in concluding this branch of the case we refer to and quote from Duke v. Taylor, 37 Fla. 64, 19 South. 172, 31 L. R. A. 484, 53 Am. St. Rep. 232. In that case, as in this case, certain individuals procured from another state what purported to be a charter, but never organized the corporation, nor transacted any business in the state where the charter was obtained, but organized and undertook to transact business in another state; and in disposing of that case the Supreme Court of Florida said:

"One of the pleas in this case, called a plea in abatement, alleges that the Florida Orange Hedge Fence Company was a corporation organized under the laws of Tennessee, and doing business in this state. According to the recognized American doctrine, the domicile and citizenship of a corporation are regarded as belonging to the state under whose laws the corporation is created. In the case of Bank of Augusta v. Earle, 38 U. S., 13 Pet. 519, 10 L. Ed. 274, it is said that 'a corporation can have no legal existence out of the boundaries of the sovereignty by which it is created. It exists only in contemplation of law and by force of the law; and where that law ceases to operate, and is no longer obligatory, the corporation can have no existence. It must dwell in the place of its creation, and cannot migrate to another sovereignty. But although it must live and have its being in that state only, yet it does not by any means follow that its existence there will not be recog-

nized in other places; and its residence in one state creates no insuperable objection to its power of contracting in another. It is, indeed, a mere artificial being, invisible and intangible; yet it is a person, for certain purposes, in contemplation of law, and has been recognized as such by the decisions of this court.' And in St. Louis v. Wiggins Ferry Co., 78 U. S. 11 Wall. 493, 20 L. Ed. 192, it is said, in reference to a corporation, that 'it can exercise its franchises extraterritorially only so far as may be permitted by the policy or comity of other sovereignties. By the consent, express or implied, of the local government, it may transact there any business not ultra vires.' In recognition of the doctrine announced in the case first cited it was held by this court in Taylor v. Branham, 35 Fla. 297 [17 South. 552, 39 L. R. A. 362, 48 Am. St. Rep. 249], that a corporation can have no legal existence out of the boundaries of the sovereignty by which it is created. It exists only in contemplation of law and by force of the law; and, where that law ceases to operate, the corporation can have no existence. It must dwell in the place of its creation, and cannot migrate to another sovereignty. And where a number of individuals assume to act in a corporate capacity in a state where they have not been clothed with corporate existence and authority, they cannot there be recognized as a legally constituted corporation, though they may have been duly incorporated in another state, and such persons, in the state where they assume corporate capacity, will be treated as and held to the responsibility of partners. In the case just cited in this court the record showed that there was an attempt at an organization of a corporation in this state under a supposed charter obtained under the general laws of Tennessee without any organization or user in that state. Where a corporation has been legally created and organized under the laws of a sister state for the transaction of any business there, it may, by comity existing between the states, transact business in this state, provided it be not in contravention of our laws of public policy. Our general incorporating laws recognize the transaction of business by foreign corporations in this state, and, in the absence of express legislative assertion to the contrary, the courts of this state would be bound to recognize the comity existing among the states. While this is true, it is also well settled that a corporation created under the laws of one state cannot hold corporate meetings in another for the purpose of organizing the corporation, electing its officers, or performing any strictly corporate functions in its organization."

In the case at bar the findings of fact and the undisputed testimony show that, while a written charter was obtained from the territory of Arizona for the Commonwealth Bonding & Casualty Insurance Company, the corporation was never organized in Arizona, but an attempt was made to organize it in the state of Texas, where most of its stockholders and directors then and ever since have resided, and virtually all of its business, as was the intention of its promoters and incorporators, has been transacted in this state. Such being the facts, we hold that the pretended incorporation constituted

a fraud upon both Arizona and Texas, and that it is absolutely void; and therefore appellants, who as its pretended directors have transacted business in its name, are liable to appellees the same as if they had executed the obligation sued on as individuals or partners.

Under the third and other assignments, appellants present the contention that they were released from liability by the change which the findings of fact show was made in the contract in reference to the construction of one of the bridges, which change is claimed was not consented to by appellants. While the change referred to materially altered the plans for the bridge, and increased the amount of compensation to be paid to the contractor therefor, it was authorized by that provision of the contract relating to changes therein. As we construe that section of the contract, changes which did not exceed 10 per cent. of $11,490, the penal sum specified in the bond, did not require the consent of appellants; and the change shown by the testimony and found by the trial court involved an amount less than 10 per cent. of the penalty mentioned in the bond.

[2] Some other questions are presented in appellants' brief, all of which are decided against them, except the one presented under the twelfth assignment of error, which complains of the action of the trial court in rendering judgment against appellants in favor of W. F. and J. F. Barnes Lumber Company and several other interveners. The parties referred to are not mentioned in the bond, and there is nothing upon the face of that instrument tending to show that it was executed for the benefit of any one other than Lampasas county; and therefore appellants, though liable to Lampasas county, as sureties upon that instrument, are not liable to the interveners, although the latter furnished material, etc., for the construction of the bridges. Natl. Bank of Cleburne v. Ry., 95 Tex. 176, 66 S. W. 203; Campbell Root Lbr. Co. v. Smith, 148 S. W. 1195; Wright v. Jones, 55 Tex. Civ. App. 616, 120 S. W. 1139 (5); Santleben v. Cement Co., 25 S. W. 143; Lumber Co. v. Villegas, 8 Tex. Civ. App. 669, 28 S. W. 558; Republic Co. v. Cameron, 143 S. W. 317; Garrett v. McAdams Co., 163 S. W. 320; Boas v. Maloney, 138 Cal. 105, 70 Pac. 1004; Gato v. Warrington, 37 Fla. 542, 19 South. 883; Standiford v. Shideler, 26 Ind. App. 496, 60 N. E. 168; Manny v. Surety Co., 103 Mo. App. 716, 78 S. W. 69; Lion Bonding Surety Co. v. Trussed Concrete Steel Co., 204 S. W. 1176 (recently decided by this court).

[3, 4] The bond in this case bears date October 26, 1914, and was executed prior to the amendment of article 5623, so as to make laborers and materialmen beneficiaries of contractors' bonds, without regard to the terms of such instrument; and therefore the rights of interveners must be determined by the law as it was prior to the amendment. That the statute in force in 1914 authorized, or even required, the county to take a bond, conditioned for the payment of laborers and materialmen, cannot affect the question. The rule of law is well settled in this state that, in order to constitute a sufficient statutory obligation, the bond must comply substantially with the terms and requirements of the statute. When it appears from the face of the instrument that no effort was made to execute a bond required by statute, the statute will not be read into the instrument in order to create liability not disclosed by the language used. It is true that in many cases instruments held to be insufficient as statutory bonds have been enforced as common-law obligations; but that rule has no application, unless it appears upon the face of the instrument that it was executed for the benefit of the person seeking to enforce it.

La Crosse Lumber Co. v. Schwartz, 163 Mo. App. 659, 147 S. W. 501, cited by counsel for appellees, is not analogous to this case. It was there held that a bond running to the board of managers of a soldiers' home, and given by a building contractor, binding him to deliver work according to contract, and free from debts or liens for material or labor, shows on its face that it was made for the benefit of materialmen and laborers, as well as for the benefit of the state, and that the former could maintain a suit upon such an obligation. That conclusion was reached because of the stipulation in the bond to the effect that the contractor was to deliver the work free from all debts or liens of every character on account of materials furnished or labor performed. But in this case the contract contains no such stipulation, and therefore that case does not support the action of the trial court in rendering judgment for the interveners.

Upon this branch of the case our conclusion is that the court committed error in rendering judgment in favor of the interveners, and such judgment will be set aside, and judgment here rendered in favor of appellants as against the interveners.

[5] Appellee Lampasas county has filed a cross-assignment, in which it is charged that the trial court erred in holding that the county had acquired no lien on the material sold to Hess & Skinner Engineering Company. Counsel for Lampasas county, in support of their contention that the court should have held that the county had a lien upon the property referred to, refer to the fact that after that property was delivered to Hess & Skinner Engineering Company, the contractor, the county paid to that company 60 per cent. of the contract price, amounting to $6,428; and inasmuch as the proof shows that

the material referred to was worth $5,263.85, and that after its delivery and the making of the payment referred to the Missouri Valley Bridge & Iron Company caused that property to be seized under a writ of sequestration, and thereafter converted it to their own use, the county was entitled to judgment against that company for the value of the material referred to.

The findings of the trial court relating to this matter are supported by testimony, and show that no dealings occurred between the county and the bridge company upon which the county could predicate any claim of estoppel, and in this respect the case is different from Ellis v. Bonner, 80 Tex. 198, 15 S. W. 1045, 26 Am. St. Rep. 731, relied upon by counsel for Lampasas county. In that case, among other things, the court said:

"If it be conceded that the title to the material remained in the building company, still it had delivered the lumber to Bonner [the landowner], and received money from him as a payment upon it under circumstances that justified him in believing, and sufficient to show an implied contract, that the very material should be used in the construction of the houses. Under such circumstances the building association would not have been allowed to take the property from Bonner's possession, and deprive him of it as a security for the money paid by him."

As before said, in this case no dealings took place between the bridge company and Lampasas county, and the material was not delivered to the county, and the county paid nothing to the bridge company. Hence we hold that Lampasas county is not entitled to an equitable lien as against the bridge company, based upon the doctrine of estoppel. Equitable liens are sometimes declared to exist, not upon the doctrine of estoppel, but because such equitable relief is necessary to afford adequate protection. Such a lien exists in favor of a vendor of real estate as against the vendee and any one possessing no better right than he has. But, if that doctrine has anything to do with this case, it inures to the benefit of the bridge company and not to Lampasas county. That company had sold the material referred to to Hess & Skinner Engineering Company, and, according to the proceedings subsequently had in the suit between the bridge company and the engineering company, the property had not been paid for, and the contract of sale and delivery of it were procured by fraud upon the part of the engineering company.

It does not appear that the bridge company had any security or any remedy other than the one which it pursued, and by which it obtained a judgment against the engineering company for the title and possession of the material referred to. On the other hand, the record shows that Lampasas county was protected by an indemnity bond, upon which it obtained judgment in this case against

214 S.W.—31

nine different persons, presumably solvent, for $7,003.85, on account of the breach of contract by the engineering company. Such were the facts and circumstances at the time the case was tried in the court below, but the nine defendants against whom the county obtained the judgment referred to have prosecuted this appeal under a supersedeas bond; and this court has not only affirmed that judgment, but has also rendered judgment for the county against the surety on the supersedeas bond.

In view of the facts referred to, which existed at the time of the trial in the lower court, we are of the opinion that, as between the bridge company and Lampasas county, the equities were in favor of the former, and that the judgment of this court affirming that judgment, and providing for its enforcement against the surety upon the indemnity bond, strengthens the bridge company's case in that respect, and affords an additional reason for holding that the company's equities are superior to those of the county.

[6] Furthermore, we sustain the contention of counsel for the Missouri Valley Bridge & Iron Company to the effect that Lampasas county having contracted with the construction company for completed bridges, and having accepted a bond as surety for the faithful performance of that contract, it thereby waived its right, if any it ever had, to invoke the doctrine of equitable liens. Crowder Bros. v. Burlington Elevator Co., 176 Mo. App. 657, 159 S. W. 741; Parker County v. Sewell, 24 Tex. 238; Bridges v. Reynolds, 40 Tex. 209; Faver v. Robinson, 46 Tex. 206, 207; Cresap v. Manor, 63 Tex. 486; Weeks v. Barton, 31 S. W. 1072; Atteberry v. Burnett, 130 S. W. 1031.

The proposition asserted on behalf of the bridge company seems to be well sustained by the authorities referred to, in one of which Chief Justice Willie, speaking for our Supreme Court, said:

"It is the settled law of this state that the taking of a distinct and independent security by a vendor of real estate, where it does not appear that he reposed as well upon his lien as upon such security, will be considered as a waiver of the vendor's lien." Cresap v. Manor, 63 Tex. 486.

Therefore the cross-assignment of Lampasas county against the Missouri Valley Bridge & Iron Company is decided against the county, and that part of the judgment will be affirmed.

So our final conclusion is that, as between appellants and interveners, the judgment of the trial court should be reversed and here rendered for appellants, and in all other respects the judgment of that court should be affirmed; and it is so ordered.

One half of the costs of appeal will be taxed against the appellants, and the other

half against appellees designated as interveners.

Affirmed in part, and in part reversed and rendered.