FRANCES E. DEMAREST, by Guardian ad litem, Appellant, *v.* JAMES A. FLACK et al., Respondents.

No public policy forbids the transaction of business in this state by a corporation formed in another state by citizens of this state for the purpose of transacting business here, or requires the exclusion from recognition by the courts of this state of such a corporation.

The absence of terms imposed by the legislature as a condition of such a corporation doing business in this state, furnishes no ground for refusing to recognize it.

The power rests with the legislature exclusively to say whether any, and, if so, what, terms shall be imposed upon such a corporation as a condition of its doing business here, and in the absence of any statute upon the subject and unless it appears that the corporation is formed to do acts prohibited by the laws of the state to its own citizens or corporations, if it is legally incorporated and entitled to recognition in the courts of the state where it was organized, it is entitled to recognition and protection in the tribunals of this state.

In an action to recover damages for injuries received by plaintiff while using a toboggan upon a slide on premises in the possession and management of defendants, the complaint alleged that defendants were a joint stock company doing business in New York city under a name given, and that the injuries arose from the negligence of their employes. The answer denied these allegations.   Upon the trial, plaintiff gave no evidence as to defendants being a joint-stock company, but endeavored to prove a joint or partnership liability based upon allegations that the premises were leased to them for the purpose of putting up the toboggan slides.   Defendants claimed that they were simply individual members of and stockholders in an incorporated company, which hired the grounds and operated the slides.   They offered in evidence a certificate of incorporation of such company under the laws of West Virginia and also the Code of said state.   These were objected to on the ground that the existence or incorporation of such company should have been pleaded. The objections were overruled.   *Held,* no error; that the defense was not one necessary to be pleaded, but was admissible under the general denial in the answer.

By said Code it appeared that such a corporation could be formed under the general laws of that state, and the certificate, which was in proper form and properly signed and sealed, showed that all the requirements of the law had been complied with.   *Held,* that the existence of an organization, so far valid as to entitle it to recognition as a corporation in the courts of this state and to transact business here, was proved.

*Montgomery* v. *Forbes* (148 Mass. 249); *Hill* v. *Beach* (12 N. J. Eq. 31); *Land Grant R. & T. Co.* v. *Bd. Co. Comrs.* (6 Kan. 245), distinguished.

It appeared that a resident of New York acted as president of the corporation under a so-called election, although it did not appear how or when he was elected; also that another resident of New York acted as treasurer; that the company was in possession of the grounds, admission to which was charged, and the moneys paid went through the treasurer's hands.   *Held,* that there was sufficient evidence of user to show the company had accepted its charter.

Under the Code of West Virginia, the certificate is evidence of the existence of the corporation; after the issuing of the certificate, the corporators named therein are required to appoint a time and place for a meet-

ing of the stockholders to elect directors, make by-laws, etc.; directors of such a corporation are required to be residents of the state, unless by resolution passed by the corporation persons of another state are permitted to be directors. It did not appear that any such resolution was passed but it appeared that the corporators and directors were citizens of New York. *Held,* that the election of non-resident directors, without a by-law or resolution permitting it, would not *ipso facto* dissolve the corporation, or take away its corporate rights or franchises.

(Argued June 5, 1891; decided October 6, 1891.)

Appeal from judgment of the General Term of the Court of Common Pleas in and for the city and county of New York, entered upon an order made at the June term, 1890, which denied a motion for a new trial and directed a judgment in favor of defendants.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Seaman Miller* for appellant. The alleged West Virginia corporation is fraudulent and void, and cannot be recognized by the courts of this state as a legally constituted corporation. (*Bank* v. *Earle,* 13 Peters, 558; *Wright* v. *Bundy,* 11 Ind. 398; *Merrick* v. *Van Santford,* 34 N. Y. 208; *Hill* v. *Beach,* 12 N. J. Eq. 35.) The court erred in dismissing the complaint and in not allowing the jury to pass upon the facts. (*Redenour* v. *Mayo,* 40 Ohio St. 13.)

*Wales F. Severance* for respondents. If the judgment appealed from was right for any reason, it will be affirmed. (*Marvin* v. *Ins. Co.,* 85 N. Y. 278–284; *Scott* v. *Morgan,* 94 id. 508–515; *Teall* v. *C. E. L. Co.,* 119 id. 654.) The plaintiff failed to establish that "the defendants" were, at the time of the accident, operating the slides. (*Southwick* v. *F. N. Bank,* 84 N. Y. 420; *Hendecker* v. *Kohlberg,* 81 id. 296; *H. Ins. Co.* v. *W. Ins. Co.,* 51 id. 93; *Stapenhorst* v. *Wolff,* 65 id. 596; *Drucken* v. *M. R. Co.,* 106 id. 157.) There are no exceptions calling for a reversal. (*Griffin* v. *L. I. R. R. Co.,* 101 N. Y. 348; *Quimby* v. *Strauss,* 90 id. 664; *Tooley* v. *Bacon,* 70 id. 34; *Wood* v. *Weimer,* 104 U. S. 786; *Ross* v.

*Campbell*, 19 Hun, 615–617; *Pusey* v. *N. J. R. R. Co.*, 14 Abb. Pr. [N. S.] 441; *Partridge* v. *Badger*, 25 Barb. 146, 171, 172; *Jones* v. *Dana*, 24 id. 395, 398, 399; *Eagle Works* v. *Churchill*, 2 Bosw. 166; *Buffalo & R. R. R. Co.* v. *Cary*, 26 N. Y. 75–77; *Macon County* v. *Shores*, 97 U. S. 309.)

PECKHAM, J.  The plaintiff alleged in her complaint that the defendants were a joint stock company doing business in New York city under the name and style of "America's Winter Carnival Company."  It was further alleged that they were the owners of the toboggan slides used at Fleetwood Park in the city of New York and that such slides were under their management and control.  The plaintiff also alleged that she had, while riding on one of the toboggans upon one of the slides in the possession and management of the defendants, been accidently and seriously injured through the carelessness of defendants or their employes, and she demanded judgment for $25,000 damages.

The defendants, by answer, denied that they were a joint stock company and also denied the allegations that they were the owners of the toboggan slides mentioned or that they were under their control, and they denied all allegations of negligence either on their own part or on that of any of their employes.

Upon the trial the plaintiff gave no evidence as to the defendants being a joint stock association, but endeavored to prove a joint or partnership liability of defendants based upon the allegation that the grounds where the accident occurred were owned by the New York Driving Club, and that in the fall of 1887 the grounds were leased by it to the defendants for the purpose of putting up these toboggan slides.

The evidence tending to show even a *prima facie* liability on the part of the defendants is of the most meagre character. We will assume, however, that the plaintiff proved enough to call upon the defendants for an answer to her cause of action.

This answer was in brief that the defendants were nothing but individual members of and stockholders in an incorporated

company which had hired the grounds, owned the toboggans and operated the slides, and that whatever liability there was, if any, in favor of the plaintiff, was borne by the incorporated company, and not by the individual stockholders therein.

To prove this defense the counsel for the defendants offered in evidence a certificate of incorporation of the America's Winter Carnival Company, as organized under the laws of West Virginia, and at the same time he offered the Code of West Virginia in evidence.

The certificate and the Code were objected to by the plaintiff's counsel on the ground that there was no allegation in the answer of the existence of a corporation or the incorporation of the America's Winter Carnival Company, and that it was necessary to plead such fact before defendants could avail themselves of the defense.

The certificate was further objected to as incompetent, immaterial and illegal.

The objections were overruled and plaintiff's counsel duly excepted.

The first ground of objection as to the necessity of pleading the defense founded on the incorporation was properly overruled. It was not a defense necessary to be pleaded. It went to the root of the cause of action, and tended to show there never had been any liability on the part of defendants. It was not an affirmative defense which in substance admitted an original cause of action, but showed facts which operated as a satisfaction thereof. It was not like a defense of payment, or a release, or an accord and satisfaction. If operative, it showed there had never been any liability, and hence it was admissible under the defendants' denial of any liability as set out in the complaint. The certificate, when read in evidence, showed that it was signed by the secretary of state of West Virginia, and that it was issued under the great seal of that state, and in it the secretary declared that the corporators therein named, and their successors and assigns, were, from the 12th day of December, 1887, until the 1st day of January, 1935, a corporation by the name and for the purposes set forth in the certificate.

It was subsequently proved, under objection and exception, that this company was, at the time of the happening of the accident, in possession of the toboggan slide in question, and was the owner thereof.

As to the second ground of objection taken by plaintiff's counsel to the introduction of the certificate, that it was incompetent, immaterial and illegal, we may assume that it raises the question of the validity of the incorporation itself, and of its sufficiency as a defense. Upon this issue a few additional facts must be stated.

The Code of West Virginia which was received in evidence shows that a corporation of the kind herein spoken of could be formed under the general laws of that state by five or more persons signing an agreement to the effect stated in the statute, and by the payment by each corporator of at least ten per cent. of the par value of the stock subscribed for by him. Affidavits on the part of at least two of the corporators stating necessary facts were also required by the statute. It is further therein provided that the agreement, acknowledgment and affidavits are to be delivered to the secretary of state, and he issues to the corporators his certificate under the great seal of the state, declaring, among other things, that they and their successors and assigns are a corporation from that date until a time therein specified. The effect of the certificate is provided for by the statute, which says that the corporators and their successors and assigns shall, from the date of the certificate until the time designated therein, be a corporation, and the certificate shall be received as evidence of such incorporation. The statute provides for the holding of meetings of the corporation, including the first general meeting for purposes of organization, out of the state, and it also provides for keeping the principal office of the corporation in any state or territory of the United States, and it permits the corporation to adopt by-laws and to prescribe the qualifications of directors, and if it be not otherwise provided, every director must be a stockholder and a resident of the state of West Virginia.

The certificate in question in this case embodies an agree-

ment among five corporators, by which they agree to become a corporation by the name of America's Winter Carnival Company, for the purpose of leasing premises for amusement, among others for toboggan slides, and they agree that its principal office shall be in the city of New York, and in this agreement, they recite that they have subscribed a certain sum (named therein) to the capital of the company, and have paid ten per cent. thereof, and that the capital so subscribed was divided into shares of one hundred dollars each, which were held by them. The names of the corporators were signed to the agreement, and their residences were therein stated as being in the city of New York. The agreement, properly signed and acknowledged, was presented to the secretary of state of West Virginia, and a certificate of incorporation duly issued, as already stated.

From the evidence it is clear, upon the question of user, that there was a person who acted as president of this company under a so-called election, although it does not appear how or when he was elected. That person was a resident of New York. There was also a person who acted as treasurer of the company, and he also resided in New York. The treasurer kept a check-book and made disbursements for the company by check, and received what money came to it, and put it in the bank. There were no by-laws. The treasurer once had charge of the stock-book of the company, though at the time when he was sworn on the trial, he did not know where it was, and he supposed the company was not then in existence.

Admission to the grounds occupied and possessed by this company was charged and the money that was paid for admission to the toboggan slides went through the treasurer's hands. No one could get in without paying toll, excepting members of the driving club.

The president and vice-president were directors, as was also the treasurer and one other stockholder. This company was in possession of the toboggan slides when the accident occurred, "and no other concern, or individuals, or anybody else." The defendant Grant said he had stock in the company, which he

paid for, and that he refused to go into the business at all, unless under an incorporation. The books of the company were not produced, and it did not appear what, if any, books had been kept by it, other than the stock and check-books spoken of by the treasurer.

This is substantially all that appears in regard to user by the corporation, and the counsel for plaintiff, upon this evidence, moved to strike out the certificate of incorporation and all the testimony relating thereto, on the ground " that the directors of the concern were residents of New York, and that under the statute of West Virginia, it was necessary, in order that the corporation be duly incorporated, that the directors of the concern should be residents of West Virginia, unless a special resolution were passed by the corporation permitting persons of any other state to be such directors." The motion was denied, and thereupon, on motion of counsel for defendants, the complaint was dismissed, because no cause of action was proved against the defendants personally. There was sufficient evidence of user to make it clear that the company had accepted its charter with all its privileges and liabilities, whatever they might be. This question of user, although not specifically taken in the above objections, has been urged upon us here by the counsel for the appellant, and we think it well enough to say what we have upon the subject. As to the other points which have been actually raised by the motion to strike out the certificate, we think a proper disposition was made of them by the court below.

By the statute of West Virginia, the incorporation precedes the election of directors. After the incorporation and subsequent to the issuing of the certificate thereof by the secretary of state, the corporators named therein, or a majority of them, are directed by statute to appoint a time and place for holding a general meeting of the stockholders to elect directors, make by-laws and transact other business. A failure to adopt a by-law at the first meeting, permitting the election of non-resident directors and the election of non-resident directors at such meeting, or at a subsequent one, in the absence of a by-law

permitting it, would not *ipso facto* dissolve the corporation or take away its corporate rights or franchises. The company would still remain a legal entity, notwithstanding its failure to adopt the proper by-law, or in its absence to elect resident directors. The counsel for plaintiff was, therefore, in error in his statement as to the law of West Virginia.

We come then to the question whether upon the facts already set out this corporation was so far valid as to be entitled to recognition as such in the courts of our state.

The plaintiff says that it clearly appears that the corporators thereof were citizens of New York and the corporation was formed by them in the state of West Virginia for the sole purpose of doing business out of that state and in the state of New York, in which latter state the principal office was also to be located. These facts he says conclusively prove the invalidity of the West Virginia corporation so far at least as this state and its citizens are concerned.

If mistaken in that view he still urges that such facts render it a question for the determination of the jury whether the incorporation was attempted to be made in good faith or as a mere evasion and in fraud of the laws of West Virginia or of New York.

He claims if the jury should find the purpose was one of evasion, that in such case the incorporation would furnish no defense and the plaintiffs would be liable as individuals.

We are quite clear the case should not be submitted to a jury to pass upon the question of evasion as matter of fact. If it were, we might find different juries coming to different conclusions upon the same facts, and we should have a corporation or no corporation according to the view a jury might take of such facts. One plaintiff might prove the evasion to the satisfaction of one jury, and another plaintiff fail on precisely the same facts, and thus we should have a corporation as to A., and no corporation as to B., and the same question constantly arising as often as the corporation or its members were sued. This would be intolerable. It must be a corporation as to all persons with whom it has business dealings, or to none.

In other words it must be a question of law instead of fact. The courts of any country recognize foreign corporations through what is termed national or state comity. (*Merrick* v. *Van Santvoord*, 34 N. Y. 208 ; *Bank of Augusta* v. *Earle*, 13 Peters, 519 ; *Christian Union* v. *Yount*, 101 U. S. 352.) But whether such recognition shall be given must be decided by the courts of the country where the corporation seeks to do business. In our state, as in others, it is a question of domestic policy, and what that policy is must be determined by an examination of our own legislation. If we find any direct enactment upon the subject, it is our duty to obey it, and in its absence we must determine the question with reference to our general legislation and to the circumstances which surround us as a great and growing commercial community, having need of and employing large amounts of combined capital and for whose prosperity and growth it is of the utmost importance that such capital should have the greatest facilities extended it for useful employment, with reasonable and proper personal exemptions from liability. We can find no reason for a domestic policy that should exclude from recognition by our courts foreign corporations generally. It may be safely said there can be no such domestic policy at the present day in a civilized state. The question then arises shall we go behind the certificate of incorporation or charter of a foreign corporation for the purpose of inquiring under what circumstances and for what purpose outside the charter it was incorporated? This can only be claimed on the ground that the charter was obtained in fraud or evasion of the laws of the state which granted it, or for the purpose of evading the provisions of our own laws.

It is plain there was in regard to the procurement of this charter no fraud upon or evasion of the laws of West Virginia, even if we should admit that such fact would constitute good ground for our refusal to recognize such corporation, although no proceedings had been taken to annul its charter in the state which granted it. This point is by no means clear.

However that may be, it is impossible not to see that the

state of West Virginia has adopted a policy which favors the formation of corporations within her borders and pursuant to her laws, while the members and officers may be non-residents and where the principal business of the corporation is to be performed outside the confines of the state.

The agreement which was signed by the corporators in this case and duly acknowledged and presented to the secretary of state of West Virginia, showed that the corporators were residents of New York, and that the principal office of the corporation was to be in New York, and the inference was a fair one that the principal business of the corporation was also to be conducted in New York. The secretary of state, to whom the papers for the organization of the corporation were presented, was compelled to pass upon and decide the question whether they conformed to the laws of West Virginia before he received or filed them or gave the certificate of incorporation. He did pass upon the question and did, thereupon, issue the certificate of incorporation under the great seal of the state and attested by his official signature.

So far as the laws of West Virginia are concerned it is plain that the corporators thereupon became a corporation, and in that state the certificate was, by the laws thereof, evidence of the existence of such corporation. There was no fraud or evasion of the law of West Virginia in thus becoming incorporated. The references to her laws above made show conclusively that the formation of corporations thus composed and for the purpose of doing their principal business outside the limits of that state was contemplated in those laws. This corporation was beyond all question legally incorporated and entitled to recognition in the state of West Virginia. Unless, therefore, it can be said that the acts of our citizens in procuring an incorporation under the laws of West Virginia for the purpose of doing business here were, as matter of law, a fraud and an evasion of our own laws and hence in conflict or inconsistent with our domestic policy, such foreign corporation is entitled to recognition and protection in our own tribunals. (*Merrick* v. *Van Santvoord, supra.*)

It is urged that such acts are thus inconsistent and in conflict with our policy because citizens of our own state are in that way enabled to evade our own laws relative to home corporations and to avoid personal liability by incorporating under the laws of foreign states, which may be more favorable to members than are our own laws. I think when this claim is examined in the light of our own legislation it will be seen that there is no substantial basis for it to rest upon. An examination of our laws shows that it is, and for many years has been the policy of this state to enlarge the facilities for the formation of corporations. General laws are on our statute book for the formation of corporations of almost every conceivable kind, and under some one of them a corporation of the kind mentioned in this case could readily be formed. The freedom from personal liability would be as great and could be as easily attained under our own as under the laws of West Virginia. The security of the creditor would not be substantially greater in the case of the domestic than in that of the foreign corporation. In the latter the creditor has the remedy by attachment and he can obtain about as easy access to its property as if it were domestic instead of foreign. ·

There is really nothing to evade by incorporating under a foreign law. No harmful results flow to a creditor or to the community here by such incorporation. Where the corporation formed under another jurisdiction comes here to do business of a kind which we permit to be done by corporations and where our laws provide for incorporating individuals for the purpose of doing that business, it is difficult to see how the terms " evasion " and " fraud " can be properly applied to acts of our citizens whereby they obtain incorporation in another state. When they come in our state to do business they must conform to our laws relating to foreign corporations and comply with the terms laid down by us as conditions of allowing them to transact business here. In the case of many kinds of corporations such conditions have already been imposed by our laws, and if there be any kind where none is imposed, it is conclusive evidence that up to this time the legislature has not

thought it conducive to the true interests of the state and its citizens to impose them. I do not intimate that it is necessary for a state to expressly by statute exclude foreign corporations from acting within its jurisdiction. The policy of the state may exclude them and that policy may be clearly established by a reference to the general legislation of a state. I find none such in the laws of this state.

It has been urged that the easy way which our laws provide for forming corporations is itself a reason why we should not recognize as a corporation those of our own citizens who have gone to another state for the purpose of incorporating themselves under the laws thereof, to do business in our own state as such corporation.

We think there is very little force in the argument. The public policy which we see in our own state, as evidenced by her laws upon the subject of the formation of corporations, is one which looks to their ready and easy formation as a means of transacting business with an accumulation of capital and an exemption from personal liability to the largest extent consistent with reasonable supervision by the state. The facilities for incorporation offered by this state are not the result of any desire to promote the formation of corporations here as against their formation in other states. They are offered because of a policy on our part which urges upon the state the propriety of furnishing them as one means of controlling the business done by them and keeping it within our borders. If in any particular case it is thought by those interested in the matter that the business can be done in our own state and by our own citizens with greater facility under the form of a foreign corporation than under that of a domestic one, there is no public policy which forbids its transaction under such form. The supervision of a foreign corporation by this state may easily be exercised by imposing terms as a condition of permitting it to do business here. The absence of any such terms in our legislation forms no reason for refusing to recognize the corporation. The power rests with the legislature to say whether any, and if so what, terms shall be imposed upon such corpo-

rations as a condition of granting them permission to do business here. Those terms can only be imposed by the legislature, and in their absence our courts ought not, merely on that account, to refuse to recognize a foreign corporation. In the absence of legislation, our courts must either refuse absolutely, or else they must recognize the right of such corporations to come to this state and do business here. The courts cannot themselves impose terms or conditions.

The case of *Montgomery* v. *Forbes* (148 Mass. 249) is not necessarily in conflict with these views. In that case the defendant, a resident of Massachusetts, went to New Hampshire and there executed and filed certain papers for the purpose of forming a corporation in that state, for the reason that its tax laws were more favorable than those of Massachusetts, and because he desired to avoid personal responsibility. The whole business was to continue to be done in Massachusetts, and these steps were taken in order to avoid the laws of that state.

The court held that the defendant had not complied with the terms of the New Hampshire act, and hence had never become incorporated. There was no tribunal in New Hampshire to which the papers in regard to a proposed corporation could be submitted and which had power to decide whether the law had been complied with, and upon compliance to issue a certificate of incorporation. But all persons filed their papers at their peril. If the question ever arose as to a compliance with the law, it had to be decided by comparing the papers with the statute. The Massachusetts court did that, and decided that the defendant did not comply with the New Hampshire statute, and that no corporation had ever been formed.

In *Hill* v. *Beach* (12 N. J. Eq. 31), the Court of Chancery of New Jersey in a proceeding for an accounting said that certain persons who had entered into an agreement with a view to form a company to do business in New Jersey, and who thereupon undertook to form themselves into a corporation under the general act of this state relative to the formation of manu-

facturing corporations, passed in 1848, and who complied with the forms of such act, would nevertheless not be recognized by the courts of New Jersey as a legally constituted corporation. The chancellor said they were not a foreign corporation, " for it is perfectly manifest upon the face of their proceedings that their attempted organization under the general law of New York respecting corporations was a fraud upon the laws of that state."

In what respect it was a fraud does not appear unless it were one because the corporators were residents of New Jersey and intended to do business in that state under the New York incorporation. From what has already been said we do not think those facts make out a case for a refusal to recognize a corporation legally constituted and existing in the foreign state.

We recognize corporations formed by the citizens of a foreign state under its laws for the purpose of doing business, among other places, in our own state. Where is the essential difference between such a corporation and one legally incorporated under such foreign state for the same purpose, but the members of which are citizens of our own state? Whose rights are jeopardized more in the case where the members of the corporation are our own citizens than where they are citizens of the foreign state? What enlightened policy is violated by the recognition of the foreign corporation composed of residents of this state, which would not also and equally suffer by the recognition thereof when composed of non-residents? And yet, beyond all cavil, our policy is to recognize the latter.

The truth is, foreign corporations are not properly to be regarded with suspicion, nor should unnecessary restraints be imposed upon their doing business in our midst. They carry no black flag, and the policy of all civilized nations is to grant them recognition in their courts. It seems to me that every reason which urges upon us the recognition of foreign corporations organized with power to do business in our state and composed of citizens of the foreign state, is equally potent

when the foreign corporation is composed of our own citizens. It has always been supposed that a state should at least deal as liberally with its own citizens as with those of foreign states. If, therefore, we permit foreign citizens to come within our limits in the form of a foreign corporation organized with power to do business here and recognized by us, why should we not permit our own citizens to avail themselves of the like privilege? If we impose terms and conditions upon foreign corporations, as such, doing business here, those same terms and conditions still and equally apply to a foreign corporation when composed of our own citizens. Why should they not be placed at least upon an equality with the foreign citizen?

The case of *Land Grant Railway, etc., Co.* v. *Board County Comrs., etc.* (6 Kan. 245), simply holds that the courts of that state will not recognize a corporation formed under the laws of Pennsylvania, where the corporation is not itself permitted to do business in the state which grants its charter. It was also stated in the above case that the charter, if enacted by the Kansas legislature, would have been void as contravening two constitutional provisions. In such a case it would scarcely be expected that a foreign state would grant greater recognition and privileges than were accorded by the state under which the corporation was formed. It might readily be supposed that no rule of comity compelled the recognition of a foreign corporation formed to do acts which are prohibited by the laws of the state to its own citizens or corporations.

It is upon this principle that *Empire Mills* v. *Alston Grocery Co.* was decided by the Court of Appeals of Texas, and reported in the Railway and Corporation Law Journal of April 11, 1891 (Vol. 9, No. 15), and to which our attention has been called. The legislature of Texas prohibited the incorporation of corporations in that state of the character of the Iowa corporation, and the court held that comity did not extend to the recognition of such a corporation by the courts of Texas.

After a careful examination of the case we have come to the conclusion that the defendants sufficiently proved the existence

of a valid corporation under the laws of West Virginia, and that there was nothing in the other facts proved which should cause us to refuse recognition of that corporation.

The result is that the complaint was properly dismissed, and the judgment to that effect should be affirmed, with costs.

All concur.

Judgment affirmed.