### SCHARBAUER et al. v. LAMPASAS COUNTY. (No. 240–3430.)

(Commission of Appeals of Texas, Section A. Nov. 30, 1921.)

**1. Corporations ⬉29(2)—Foreign corporation held a corporation de facto, legality of which was not subject to collateral attack.**

A foreign corporation, which, at the time of application for its license to transact business in Texas, was incorporated under the general laws of the state of its domicile, for purposes authorized also by the laws of Texas, was a de facto corporation, the legality of which could be attacked only by the state in a direct proceeding and not collaterally in proceedings by private individuals or other corporations.

**2. Corporations ⬉631—Courts must enforce rule of comity permitting foreign corporation to transact business in state until modified by Legislature.**

The rules of comity, under which a corporation created in one state may secure a permit to transact business in other states, have the controlling force of legal obligations until modified by the Legislature, and it is the duty of the courts to observe and enforce them until the sovereign otherwise directs; the comity involved being that of the state, not of the courts.

**3. Partnership ⬉41—Directors of insolvent foreign surety company held not liable as partners.**

The directors of a surety company incorporated under the law of a foreign state, approval of the charter by which carried with it, so far as a suit by a county in this state on a contractor's surety bond was concerned, approval of the company's directorate, the members of which were all residents of this state, were not liable on such bond as partners, after the appointment of a receiver, in absence of allegations of misrepresentations as to compliance with the statutes of this state (Rev. St. 1911, arts. 1314–1321, 4928, 4930), as to full payment of capital stock or deposit of securities, as prerequisites to the granting of its permit to do business herein, especially where defendants thought, until just before the receivership was granted, that the capital stock was paid up; there being such color of lawful organization as to prevent the proceedings being held void on collateral attack on the ground of antecedent fraud on the states in procuring the charter and permits.

Error to Court of Civil Appeals of Third Supreme Judicial District.

Consolidated actions by Lampasas County against the Hess & Skinner Engineering Company and others, wherein certain parties intervened, and John Scharbauer and others were made parties defendant. Judgment for plaintiff against John Scharbauer and certain other defendants was by the Court of Civil Appeals affirmed in part and reversed and rendered in part (214 S. W. 468), and John Scharbauer and others bring error. Reversed and rendered.

Olie Speer and Marvin H. Brown, both of Fort Worth, for plaintiffs in error.

J. Tom Higgins and Matthews & Browning, all of Lampasas, for defendant in error.

TAYLOR, P. J. Lampasas county, in one cause, sued the Hess & Skinner Engineering Company as principal and the Commonwealth Bonding & Casualty Insurance Company as surety, upon a bridge building contract; and, in another, sued the sheriff of the county and the Missouri Valley Bridge & Iron Company, to determine the right to certain bridge materials. The two causes were consolidated. Parties not necessary to be named intervened asserting claims as materialmen and laborers.

Pending the suit, J. W. Mitchell was appointed receiver of the bonding company by one of the district courts of Fort Worth, and the receiver was made a party defendant to the consolidated action. Thereafter the county made the directors of the bonding company, B. F. Allen, Jr., W. P. Dial, E. A. Fancher, C. D. Hill, Bacon Saunders, John Scharbauer, C. C. Terrell, Jno. L. Terrell, C. D. Reimers, and Ben F. Allen, Sr., parties de-

---

⬉For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

fendant, seeking recovery against them on the theory that they were liable on the bond as partners.

The cause was tried before the court without a jury. Judgment was rendered in favor of the county against the engineering company and all of the individuals named as directors, except B. F. Allen, Jr., and in favor of some of the interveners. The county failed to recover against the bonding company and the receiver, and judgment was entered in their favor.

The Court of Civil Appeals affirmed the judgment of the trial court against the directors. 214 S. W. 468. It is not necessary to state what disposition was made of the judgment as affecting the interveners. Writ of error was granted upon the application of Jno. Scharbauer and the other directors alone. Consequently the cause presented for review is between the county and the directors of the company.

The grounds upon which it is alleged that the directors are individually liable are that at the time of the pretended incorporation of the company under the laws of Arizona all of its stockholders were citizens of Texas; that, so far as paid for in this state, its corporate business, including the election of directors and officers and the keeping of books and records, was done in this state; that its general headquarters and principal place of business was in Fort Worth, Tex.; that the directors, without any bona fide intention of transacting business in Arizona, went into that territory and procured from it a pretended charter for the purpose of transacting business in Texas; and that the pretended incorporation was a fraud upon the laws of Arizona.

It is further alleged that Arizona laws under which the company was organized, provided that no corporation should be formed for the transaction of any kind of insurance business, except live stock, without a subscribed capital stock of at least $100,000, 25 per cent. of which must be paid in before the issuance of any policy by the company; that it was the original plan for the company to be incorporated under the laws of Texas; but that afterwards, about March 20, 1911, it was determined by the stockholders, directors, and executive committee of the company, following an investigation of the laws of various states and territories, that it would be to the interest of the stockholders to have the company incorporated under the laws of Arizona, because they could file with the insurance department of that state notes executed by the stockholders in payment of stock, whereas under the Texas laws that could not be done, and because under a charter obtained in Arizona the company could transact more different kinds of insurance business than could be transacted under a charter obtained

in Texas; that about March 23, 1911, the directors of the bonding company filed its charter in Arizona; that it became incorporated under the laws of that territory (if their action in regard thereto did not invalidate its incorporation); that by the charter so filed the company was attempted to be organized to do a fidelity, guaranty, and surety business and other business in any part of the world with an organized capital stock of $300,000; that afterwards about June 17, 1911, the company filed its statement with the Commissioner of Insurance and Banking of the State of Texas, and on that day a permit was issued to it to transact business in Texas; that annual statements of the company were made as required by law and filed with the Commissioner, who issued to it licenses or permits to transact business in the state each year, the last permit being issued about February 25, 1915; that such companies were required by the laws of Texas to place on deposit with the State Treasurer $100,000 in good securities as a prerequisite to the issuance of permits; that prior to June 13, 1911, the directors of the company deposited with the Treasurer a large lot of securities of the apparent values of $150,172.50; that the depositing of said securities was an evasion of the laws of the state of Texas, in that the bonding company and its promoters sold a large amount of the capital stock of the company, and instead of receiving cash therefor, took from the purchasers thereof their notes in payment, and that it was these notes and other securities that were so deposited with the Treasurer.

Failure to comply with the Arizona laws as to paying up the capital stock was alleged; also, the filing of false and fraudulent statements with the Commissioner of Insurance and Banking of the State of Texas for the purpose of procuring permits to do business in this state. The deduction drawn by the pleader was that the company had no lawful authority to do business in Texas, and that in consequence thereof, and of the execution of the bond, the directors became liable as partners for the payment of any obligations incurred by the company, even though it may have been legally incorporated in Arizona.

The provisions of the contract to build the bridges and the abandonment of the work by the contractor and the completion of the work by the county were alleged.

Plaintiffs in error answered by general demurrer and special exceptions, and a denial of those allegations not admitted in the answer. They pleaded specially that the company was both a de jure and de facto corporation incorporated under the laws of Arizona; that at all times after the incorporation until the appointment of a receiver it was authorized to do business in the state of Texas, and that it did business lawfully and regularly

as a corporation not only in Texas, but in the states of Alabama, California, Louisiana, and the territory of Arizona, as well; that in the matter of executing·and accepting the bond, the company acted as a corporation only, and was treated by the county as a corporation, and in no other capacity; that the pleadings of Lampasas county constituted a collateral attack upon the validity of the incorporation of the company and its licenses and permits to transact business in Texas, whereby the county was estopped to deny that it was a corporation. There were other defensive pleas to which it is not necessary to refer.

It was agreed on the trial that on March 23, 1911, the company was incorporated under the laws of the territory of Arizona (as to this agreement the county reserved the right to attack the validity of the incorporation and the company's right to do business in this state); that the company's directors were elected annually at Fort Worth, Tex.; that after incorporation the company applied for and obtained permission to transact business as an insurance company in 1911 in the states of California, Louisiana, Alabama, and Texas; that the bond was executed by the company as a corporation under the laws of Arizona, and that the county dealt with it as such; that each year after incorporation, until and including the year 1915, the state of Arizona issued to the company its permit to transact business in that state in accordance with its charter; that after the filing of its annual statements each year in the office of the Commissioner of Insurance and Banking of this state, the Commissioner issued to it licenses or certificates of authority to do business in Texas as an insurance company with authority to execute surety bonds, the last of the permits having been issued April 22, 1915; that plaintiffs in error at no time contemplated becoming partners or transacting the affairs of the company as a copartnership.

The articles of incorporation are regular on their face. Article 1 sets out the name of the corporation and provides that its principal place of business is in Phœnix, Ariz.; that offices may be established and business transacted and meetings of stockholders and directors may be held in such places within and outside of Arizona as the by-laws of the company shall provide. Article 2 sets out at length the purposes for which the corporation was organized, one of which was to act as surety. The remaining articles state the time of the commencement of the corporation, the time of its termination, its right of succession, that by-laws shall be adopted, the right to amend, order, or repeal any part of the charter in the manner prescribed by the statutes, the amount of the capital stock, etc. The charter provides for an executive committee and board of directors, limits the amount of indebtedness to which the corporation shall subject itself, and provides that the private property of the stockholders shall be forever exempt from corporate debts. The articles were filed, and the charter was granted March 23, 1911. Nine persons, including John Scharbauer, were named in the charter as directors and officers to serve until their successors should be elected and qualified.

The trial court found that the reasons for incorporating the company under the laws of Arizona were that payment for stock subscribed was not, under the laws of that state, required to be made in cash, labor done, or property actually received, as required under the Constitution and laws of Texas, and that under the Arizona charter the company could transact more different kinds of insurance than could be done under a charter obtained in Texas. The court found, also, that subsequent to the granting of the charter, the directors of the company have resided in Texas; that its principal place of business was Fort Worth. Tex., where its organization meeting and all of the meetings of its stockholders and directors were held; that in payment for subscriptions for capital stock the subscribers paid but a small amount in money, or labor done, or property actually received; that they executed their notes to the company for the balance of the amount subscribed; that at the time of the pretended organization of the company, and until after it had commenced business, the amount of capital stock that had been paid in money, labor, and property did not exceed $17,000; that the proof does not show that thereafter any further sums were paid on capital stock, but does show that certain notes executed by the stockholders were used in the purchase of Dallas city bonds in the value of $50,000 or that such notes were sold for cash, which was invested in such bonds; that the company never at any time possessed available cash assets, exclusive of stock notes, to the amount of $100,000 over and above all liabilities; that the company in 1911 deposited with the State Treasurer of this state notes given by the stockholders in payment of capital stock of the face value of $150,000 and deposited other of said notes with the insurance departments of Arizona or California, where the company was doing business through agents; that soon after the company's organization it filed in the office of the Commissioner of Insurance and Banking of this state its report of its condition, as required, and thereafter filed annually similar reports; that in a reasonable time after each report was filed, permits were issued authorizing the company to transact a guaranty and suretyship business in this state; that in each of the reports it was stated that the amount of the capital stock of the bond-

ing company paid up in cash was $300,000, which statement was false and untrue; that at the time the reports were made the persons making them believed them to be true, and believed the capital stock to be paid up in full where the subscribers had executed their notes therefor, and the directors were never informed or believed that the capital stock issued and notes given were invalid until a short time before a receiver on September 18, 1915, was appointed for the company.

The Court of Civil Appeals sustained the judgment against plaintiffs in error under the view that, while the charter was obtained in Arizona, the corporation was never organized there; that the pretended incorporation constituted a fraud upon the laws of both Arizona and Texas, and was absolutely void; and that the company's pretended directors having transacted business in its name, including the execution of the bond sued on, are liable just as if they had executed it as partners.

The question to be decided is whether plaintiffs in error are liable as partners for any default under the bond.

The authorities cited by the Court of Civil Appeals, except the Missouri Court of Appeals cases, subsequently in effect overruled by the Supreme Court of Missouri, do not sustain the court's conclusion, in our opinion.

In Franco-Texas Land Co. v. Laigle, 59 Tex. 339, the question of the invalidity of the incorporation proceedings, or the individual liability of any of the members of the corporation, was involved. The collateral attack made was upon the legality of the election in Paris, France, of a board of directors of a Texas corporation whose charter provided that its principal office for the transaction of business (purely corporate business) should be Weatherford, Tex. The act of the illegally elected board of directors complained of was held void, but it was recognized that the company's business, such as is usually performed by mere agents, could be transacted in France.

Bank of De Soto v. Reed, 50 Tex. Civ. App. 102, 109 S. W. 256, merely holds that the filing of the charter with the Secretary of State is essential to bring the company into existence either as a de facto or de jure corporation, and that subscribers to stock in such corporation beginning business before the filing of their charter became liable as partners for their acts and contracts. In Duke v. Taylor, 37 Fla. 64, 19 South. 172, 31 L. R. A. 484, 53 Am. St. Rep. 232, the court held the associates liable as partners on the ground that there was no sufficient proof to sustain the plea that the company was a corporation organized under the laws of Tennessee and doing business in Florida. The court says:

"In the first place, the laws of Tennessee, authorizing the formation of such a corporation as the supposed charter purports to create, were not put in evidence so far as the record shows, and we do not see that we can take judicial knowledge of the laws of another state under which a corporation is claimed to have been created. The authorities indicate that proof of such laws must be made in order that the court may see the legal warrant for the creation of such corporations."

In Taylor v. Branham, 35 Fla. 297, 17 South. 552, 39 L. R. A. 362, 48 Am. St. Rep. 249, the same character of case as Duke v. Taylor, there was no proof that the defendants took any step whatsoever to acquire corporate existence and authority in Florida, but relied entirely upon their incorporation in Tennessee as giving them the status in Florida of a corporation. In the Florida cases there was, of course, no corporation either de jure or de facto in that state.

Nor was there even a de facto corporation in Davis, Receiver, v. Allison, 109 Tex. 440, 211 S. W. 980. The original incorporators made no attempt to organize the company under the special act of the Legislature of 1871 (Sp. Acts 12th Leg. C. 264) authorizing its organization. Chief Justice Phillips, speaking for the court in that case, says:

"Here, there was not only no organization of the corporation within a reasonable time, but none up to the adoption of the Constitution of 1876. Section 16 of article 16, as then adopted, prohibited the existence of banking corporations—the kind of a corporation authorized by this special act. * * * The corporation authorized by this special act not having been organized prior to the adoption of the Constitution of 1876, it necessarily became, under the Constitution, a prohibited corporation. Thereafter it could have no legal existence, could possess no corporate powers, and could exercise no corporate function."

The Missouri cases cited, Cleaton v. Emery, 49 Mo. App. 349, and Hyatt v. Van Riper, 105 Mo. App. 664, 78 S. W. 1054, which follows the Cleaton Case, and Journal Co. v. Nelson, 133 Mo. App. 482, 113 S. W. 690, cited by the Court of Civil Appeals, appear to sustain the proposition that a charter obtained through fraud is void and subject to collateral attack. These decisions, however, were by the Kansas City Court of Appeals, and their holding, which has materiality in this case, was not adopted by the Supreme Court of that state. In Webb v. Rockefeller, 195 Mo. 57, 93 S. W. 777, 6 L. R. A. (N. S.) 872, the Supreme Court of Missouri say:

"Our attention is called * * * to the decision of the Kansas City Court of Appeals in Hyatt v. Van Riper, 105 Mo. App. 664, loc. cit. 671, 78 S. W. 1043, wherein that court discussed the liability of the incorporators to be held liable as copartners. It was conceded in that case that there was no actual false representation made by the defendant to the plain-

tiff as to the capital stock having been fully paid up to induce the latter to enter into the contract, but the court in that case said: 'The defendants, in procuring the corporation without having paid any part of their subscription to the stock of the corporation, no doubt committed a fraud upon the state for which, upon the hearing of a writ of quo warranto, its charter would be annulled. But its existence as a corporation cannot be inquired into in this proceeding. If, however, its incorporation under the circumstances was a fraud upon the state, it was likewise a fraud upon third persons having dealings with it. And to so hold would in no sense be challenging its corporate existence. It is not a party to the suit, and, notwithstanding plaintiff says it has no corporate existence, we think differently.' Accordingly the conclusion was reached that upon this ground alone the defendants could be, and were, held liable as copartners.

"Unquestionably the learned Court of Appeals, in our opinion, was correct in holding that a failure to pay any part of their subscriptions to the stock by the incorporators was a fraud upon the state, for which the state in a direct proceeding might have the charter annulled. It was also correctly held in that case that the existence of the corporation could not be inquired into in that collateral proceeding. But we cannot give our assent to the remaining proposition, in the language quoted above, to the effect that, because the failure to pay the full amount of their subscriptions was a fraud upon the state, it was likewise a fraud upon third persons having dealings with it, if by this it is meant that any individual, dealing with the corporation as such could allege such failure by the incorporators to pay their subscriptions to stock as a ground for holding the incorporators liable as copartners to such third person upon the sole ground that such failure to pay them was a fraud upon him. On the contrary, the great weight of authority is to the contrary. We have fully reviewed the authorities on this subject in Bank v. Rockefeller, and reached the conclusion that the rule is well established that the courts are bound to regard a company, incorporated according to all the required forms of law, as a corporation so far as third parties are concerned until it is dissolved by judicial proceeding on behalf of the government which created it. * * * We accordingly find ourselves unable to agree with our Brethren of the Kansas City Court of Appeals on this point, and, with all due respect to the members of that court, so much of that opinion as holds that the incorporators may be charged as partners in a collateral proceeding by a creditor of the company, on the sole ground that a failure to pay for their stock for which they have subscribed is a fraud, and that opinion to that extent, is disapproved."

The Kansas City Court of Appeals in a more recent case states that it is the law of Missouri that failure of incorporators to pay into the company's treasury a part or all of the money due on the stock issued to them does not have the effect, in a collateral suit against the company by private persons, to nullify the certificate of the Secretary of State granting to the company the right to be a corporation. O'Kell v. Irrigation Co., 181 Mo. App. 427, 168 S. W. 889.

Empire Mills v. Alston Grocery Co., 15 S. W. 505, 12 L. R. A. 366, a case decided by the Court of Appeals of this state, is clearly distinguishable from this case on the facts. The pretended associates obtained a charter from the state of Iowa authorizing the transaction of a mercantile business in Texas. The associates were held liable as partners in a suit against them by a creditor of the pretended corporation. The issuance of a charter for the transaction of business stated in the Iowa charter was not authorized by the laws of Texas. As pointed out in Leschen v. Moser, 159 S. W. 1018, much importance was given to the fact that the Legislature of this state had repealed the statute permitting incorporation for mercantile purposes, thereby indicating a policy at that time not to permit the transaction of that character of business by corporations. The laws of Texas, however, do authorize the transaction of the business of suretyship by corporations, foreign as well as domestic, upon compliance by them with the requirements of the law; hence the Empire Mills Case is not in point.

The issues in the case of American Salt Co. v. Heidenheimer, 80 Tex. 344, 15 S. W. 1038, 26 Am. St. Rep. 743, are more closely analogous to the issues under consideration than those involved in the Empire Mills Case or the Laigle Case, supra. Plaintiff sought to hold as partners certain stockholders of the Texas corporation on the ground of its illegal organization. Judge Gaines states in the opinion that the vice in the articles filed in the office of the Secretary of State was that none of the persons who signed the charter were citizens of Texas, citing the article of the statutes which provided that at least two of the signers should be citizens of Texas. He pointed out that it was the duty of the Secretary of State to inquire into the question of citizenship, and that finding no two of the subscribers to be citizens of the state, it would be his duty to decline to file the charter. Speaking further he says:

"The pretended charter in this case alleges that two of the subscribers are residents of the state of Texas, but does not allege that either of them is a citizen. Such being the facts, we think there can be no question that we have a case of a corporation de facto—that is to say, not a corporation legally constituted, but a corporation organized and operated under color of the law."

"We are of the opinion that the evidence shows that the Texas Salt Company was not legally incorporated, but that until the pretended charter was vacated it was a corporation de facto."

The court held the stockholders were not liable as partners.

[1] The conclusion in the Heidenheimer Case on the matter of collateral attack on the incorporation proceedings of a de facto corporation is in line with the general trend of authority on that question.

It is stated in section 234, vol. 1, of the Seventh edition of Cook on Corporations, that the great weight of authority has clearly established the rule that, where a supposed corporation is doing business as a de facto corporation, the stockholders could not be held liable as partners, although there were irregularities or mistakes in corporating the company; that the corporation is a de facto corporation where there is a law authorizing such a corporation and where the company has made an effort to organize under the law and is transacting business in a corporate name.

In Bond & Braswell v. Scott Lumber Co., 128 La. 818, 55 South. 470, it is stated that—

"No one can question the regularity of the incorporation except the state where the statutes allow incorporation, and the company has endeavored to incorporate, and is actually acting as a corporation"—citing Leader Realty Co. v. Lakeview Land Co., 127 La. 1059, 54 South. 350.

See, also, Cochran v. Arnold, 58 Pa. 399.

Section 216, vol. 14, Corpus Juris, is as follows:

"The general rule, supported by an almost unanimous concensus of judicial opinion, and sometimes expressly declared by statute, is that the legality of the existence of a de facto corporation can be questioned only by the State in a direct proceeding, and cannot be collaterally attacked or litigated in actions or proceedings between private individuals or other corporations, or between them and the alleged corporation itself."

It is said in Snider's Co. v. Troy, 91 Ala. 224, 8 South. 658, 11 L. R. A. 515, 24 Am. St. Rep. 887, that—

"Corporations may exist either de jure or de facto. If of the latter class, they are under the protection of the same law, and governed by the same legal principles as those of the former, so long as the state acquiesces in their existence and exercise of corporate functions. A private citizen whose rights are not invaded, who has no cause of complaint, has no right to inquire collaterally into the legality of its existence. This can be done only in a direct proceeding on the part of the state."

In our opinion the company at the time of making application for a license to transact business in Texas had acquired the status of a de facto corporation. The general laws of the state of its domicile authorized incorporation for the purposes stated in its charter. The laws of this state authorized the formation of corporations for the same purposes, so far as those purposes are material in this case. Whether the act of the Commissioner of Insurance and Banking in granting the permit should be held to be a nullity, under the facts stated, is the next question to be considered.

The following is stated in the notes of an article appearing in the March issue, 1908, of Harvard Law Review (volume 21, p. 323):

"Where associates are incorporated by State M. they cannot act as a corporation in state N., unless the courts of state N. see fit to give validity to the incorporation. Where the courts of state N. have refused to give validity to a foreign corporation, they have held the associates to full liability on their contracts."

Taylor v. Branham, 35 Fla. 297, 17 South. 552, 39 L. R. A. 362, 48 Am. St. Rep. 249, Cleaton v. Emery, 49 Mo. App. 345, Davidson v. Hobson, 59 Mo. App. 130, and Empire Mills v. Alston Grocery Co., 15 S. W. 505, 12 L. R. A. 366, are cited by the author in support of his statement. Most of the cases, including Empire Mills v. Alston Grocery Co., have already been discussed. The continuation and conclusion of the note referred to is as follows:

"It may be noted in passing that the present tendency of the courts is to go far in giving validity to a foreign incorporation. See Demarest v. Flack, 128 N. Y. 205; Second Bank v. Hall, 35 Ohio State, 158."

In Demarest v. Flack, 128 N. Y. 205, 28 N. E. 645, 13 L. R. A. 854, cited in the foregoing excerpt, the corporation was organized in West Virginia by citizens of New York for the sole purpose of doing business out of that state and in the state of New York, in which latter state the principal office was located. The company was operated under the style of America's Winter Carnival Company. Plaintiff alleged that she suffered personal injury due to the negligence of the company, and sued for damages. She sued the defendants as members of a joint-stock company, and endeavored to prove a partnership liability. The defendants denied that they were a joint-stock company, and alleged that they were nothing but individual members and stockholders in an incorporated company. The certificate of incorporation was regular on its face. The Code of West Virginia was received in evidence to show that a corporation of the kind organized could be formed under the general laws of that state. Organization of the company and user by the incorporators was proved. The defendants urged the invalidity of the incorporation in West Virginia on the ground stated, and asserted that the facts conclusively proved such invalidity. It was further urged that in the event the organization could not be held invalid as a matter of law the jury should be permitted to determine whether the incorporation was attempted to be made in good faith or as a mere evasion of, and in fraud of, the laws

of West Virginia and New York. The court, speaking through Judge Peckham, say:

"It is plain there was in regard to the procurement of this charter no fraud upon, or evasion of, the laws of West Virginia, even if we should admit that such fact would constitute good ground for our refusal to recognize such corporation, although no proceedings had been taken to annul its charter in the state which granted it. * * * Unless, therefore, it can be said that the acts of our citizens in procuring an incorporation under the laws of West Virginia for the purpose of doing business here were, as a matter of law, a fraud and an evasion of our own laws, and hence in conflict or inconsistent with our domestic policy, such foreign corporation is entitled to recognition and protection in our own tribunals. * * * There is really nothing to evade by incorporating under a foreign law. No harmful results flow to a creditor or to a community here by such incorporation. Where the corporation formed under another jurisdiction comes here to do business of a kind which we permit to be done by corporations, and where our laws provide for incorporating individuals for the purpose of doing that business, it is difficult to see how the terms 'evasion' and 'fraud' can be properly applied to acts of our citizens whereby they obtain incorporation in another state. When they come in our state to do business, they must conform to our laws relating to foreign corporations, and comply with the terms laid down by us as conditions for allowing them to transact business here. In the case of many kinds of corporations such conditions have already been imposed by our laws; and, if there be any kind where none is imposed, it is conclusive evidence that up to this time the Legislature has not thought it conducive to the true interests of the state and its citizens to impose them. * * *

"The case of Land Grant Ry., etc., Co. v. Board of County Commissioners, etc., 6 Kan. 245, simply holds that the courts of that state will not recognize a corporation formed under the laws of Pennsylvania, where the corporation is not itself permitted to do business in the state which grants its charter. It was also stated in the above case that the charter, if enacted by the Kansas City Legislature, would have been void as contravening two constitutional provisions. In such a case it would scarcely be expected that a foreign state would grant greater recognition and privileges than were accorded by the state under which the corporation was formed. It might readily be supposed that no rule of comity compelled the recognition of a foreign corporation formed to do acts which are prohibited by the laws of the state to its own citizens or corporations.

"It is upon this principle that Empire Mills v. Alston Grocery Co. was decided by the Court of Appeals of Texas, and reported in the Railway and Corporation Law Journal of April 11, 1891, vol. 9, No. 15, and to which our attention has been called. The Legislature of Texas prohibited the incorporation of corporations in that state of the character of the Iowa corporation, and the court held that comity did not extend to the recognition of such a corporation by the courts of Texas."

The Demarest Case was criticized by Judge Thompson in his Commentaries on the Law of Corporations (volume 6, par. 7895) under the heading "Status of Tramp Corporations." The criticism is quoted at length in the opinion of the Court of Civil Appeals. It is significant, however, that the criticism has been omitted from the last edition of Judge Thompson's treatise. In the last (second) edition of Thompson on Corporations (paragraph 6632), under the heading "Tramp Corporations," it is stated that the fact that all the incorporators reside in another state and carry on all the business of the company there will not make a corporation void, if it complies with the laws of the state under which it is incorporated. It is stated further in the same connection that some of the states have statutes which direct the state officers to refuse licenses to foreign corporations to do business in the state when such corporations are organized under the laws of the foreign state by citizens and residents of the state for the purpose of evading its laws. It is further pointed out, in the paragraph referred to, that the Missouri Supreme Court has held in State v. Cook, 181 Mo. 596, 80 S. W. 929, that where a corporation was organized in New Jersey for a purpose not contrary to the public policy of Missouri and duly complied with all the statutory requirements necessary to do business in Missouri, the fact that all but one of its shares of stock were subscribed for by Missouri citizens, and that its property and business were mainly located in that state, was insufficient to show that it was formed for the purpose of evading the Missouri laws so as to authorize the Secretary of State to refuse it a license in that state under a statute giving him that power.

[2] It is under principles of comity that a corporation created in one state is permitted to secure a permit to transact business in other states. It is pointed out in Corpus Juris, vol. 14a, § 3928, that the rules of comity are subject to local modification by the Legislature, but that until so modified they have the controlling force of legal obligations, and that it is the duty of the courts to observe and enforce them until the sovereign otherwise directs. The comity involved is the comity of the state, not of the courts. It is presumed to exist until a state expresses an intention to the contrary.

[3] An examination of our laws relative to the granting of permits to foreign corporations to transact business in this state discloses that our Legislature has not yet seen fit to deny admission to foreign corporations to transact business in this state on the ground that the organizers of the foreign corporations reside in this state, or on the ground that the method provided for paying up the capital stock of the corporation is

not identical with the requirements of our own law.

Our statutes relating to foreign corporations generally (articles 1314 to 1321, R. S. 1911) provide that such corporations desiring to transact business in this state are required to file with the Secretary of State a duly certified copy of their articles of incorporation; that thereupon the Secretary of State shall issue to such corporation a permit to do business in this state; that the corporation shall show to the satisfaction of the Secretary of State that at least $100,000 in cash of their authorized capital stock has been paid in, or that 50 per cent. of their authorized capital stock has been subscribed, and at least 10 per cent. of the authorized capital stock has been paid in, before such permit is issued; that the designated officers of the corporation shall make an affidavit in writing stating that it is not a trust or organization in restraint of trade, etc.; that it is the duty of the Secretary of ·State to require satisfactory proof as to the amount of capital actually invested in this state before issuing the permit; that the corporation on obtaining such permit shall enjoy all the rights and privileges conferred by the laws of this state on domestic corporations; that it shall have certain rights with respect to the purchase, holding, sale, and mortgage, etc., of real and personal estate.

Articles 4928 and 4930, Revised Statutes 1911, relating to the transaction of the business of suretyship in this state by foreign insurance companies, provide that such companies shall file with the Commission of Insurance and Banking an affidavit showing that the company has on deposit with the State Treasurer of its home state $100,000, or more, in money, bonds, or other securities for the protection of its policy holders; that the company must be authorized under the laws of the state where incorporated, and under its charter, to become surety upon the character of bonds and undertakings referred to in the statute; that it must have a fully paid up and safely invested and unincumbered capital of at least $100,000, etc.; that it must file with the Commissioner of Insurance and Banking certified copy of its certificate of incorporation, a written application, to be authorized to do business under the laws of this state relating to surety companies, and accompany such application and file each year thereafter a statement verified under oath stating the amount of its paid-up cash capital, etc.; that if the company be organized under the laws of any other state than this state it must also have on deposit with the state officer of one of the States of the United States not less than $100,000 in good securities deposited with and held by such officer for the benefit of the holders of its obligation; that it must also have on deposit with the Treasurer of this State at least $50,000 in good securities worth at par at market value at least that sum, of the value of which securities the Commissioner of Insurance shall judge, held for the benefit of the holders of the obligations of such company.

The foregoing résumé of our statutes relating to foreign corporations fairly represents the legislative policy of the state with respect to such corporations. It will. be noted that the Legislature has not sought to impose upon foreign companies seeking admission in this state the requirement of paying up their capital stock in the same manner as is required under the Constitution and laws of Texas with respect to domestic corporations. The safeguards that the Legislature has seen fit to throw around the operations in this state of foreign guaranty and suretyship companies consist in the requirements stated relating to capital stock and security deposits. It will be noted that the Legislature has seen fit to provide that the Commissioner of Insurance shall judge of the value of the securities to be deposited, and that it is upon a showing made to him that the permit to transact business is issued.

The individual liability of the directors, if any, must be predicated, under the facts of this case, upon such invalidity of the incorporation proceedings as to warrant the conclusion that the company had no corporate existence either de jure or de facto in Arizona, or upon the total invalidity of the permits granted the company to transact business in Texas.

The articles of incorporation were duly filed. They provided expressly, in accordance with the law of Arizona, that the time of the commencement of the corporation should be the date of the filing of the articles. Article 4 carried the names of those who ·were to serve as directors until their successors were elected and qualified. Approval of the charter by the Arizona Corporation Commission carried with it, in so far as this suit is concerned, an approval in Arizona of the company's directorate. Certainly there was such color of lawful organization as to prevent its being held collaterally in this state that the incorporation proceedings were void.

The facts do not warrant, in our opinion, a collateral attack upon the licenses under which the company operated for several years in this state. The fraud relied upon was not alleged to have been perpetrated by plaintiffs in error upon the county. No misrepresentation as to payment of capital stock, or securities deposited, was alleged to have been made by them as an inducement to the county to permit the execution of the bond sued on. It was merely an antecedent fraud upon the states in procuring the charter and permits that was alleged. In fact, the court found that plaintiffs in error thought until

(235 S.W.)

just before a receivership was granted that the capital stock was paid up. Plaintiffs in error were transacting business as a de facto foreign corporation under a license granted by this state, and not, in our opinion, as individuals. They are not liable therefore as partners.

We recommend that the judgments of the trial court and Court of Civil Appeals be reversed, and that judgment be rendered in favor of plaintiff in error.

GREENWOOD and PIERSON, JJ. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.